[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-10702

_____

In re: WARREN LEE HILL, JR.,

Petitioner.

_____

On Appeal from the United States District Court for the
Middle District of Georgia

_____

Before BARKETT, HULL and MARCUS, Circuit Judges.

HULL, Circuit Judge:

This case comes before this Court on Petitioner Warren Lee Hill, Jr.'s

Application, under 28 U.S.C. § 2244(b)(3)(A), for permission to file a second or

successive federal petition for a writ of habeas corpus under 28 U.S.C. § 2254 in

the district court. After review, we must deny the Application because Hill's claim

of mental retardation, proposed in his successive petition, was already presented in

his first petition and is barred by the statutory prohibition in § 2244(b)(1).

Additionally, Hill's mental retardation claim challenges only his eligibility for a death sentence, and not whether he is "guilty of the underlying offense," and thus does not fall within the narrow statutory exception in § 2244(b)(2)(B)(ii) anyway.

## I.  PROCEDURAL HISTORY

### A.  Malice Murder Conviction and Unanimous Death Sentence

In 1990, while serving a life sentence for murdering his girlfriend, Hill murdered another person in prison.  Using a nail-studded board, Hill bludgeoned a fellow inmate to death in his bed.  As his victim slept, Hill removed a two-by-six board that served as a sinkleg in the prison bathroom and forcefully beat the victim numerous times with the board about the head and chest as onlooking prisoners pleaded with him to stop.  Although in jail for life for one murder, Hill continued to kill.

A jury unanimously convicted Hill of malice murder and unanimously imposed a death sentence.  See Hill v. State, 263 Ga. 37, 427 S.E.2d 770, 774 (1993).

### B.  No Mental Retardation Claim at Trial or on Direct Appeal

In 1988, the State of Georgia abolished the death penalty for mentally retarded defendants.  See O.C.G.A. § 17-7-131 (1988 statute prohibiting the death penalty where defendant proves mental retardation).  Therefore, at the time of Hill's 1991 trial, Georgia prohibited executing mentally retarded defendants.  Yet

at his trial and on direct appeal, Hill never claimed to be mentally retarded. Rather, it was five years after his 1991 trial that Hill claimed for the first time he was mentally retarded and thus could not be executed.

Importantly, at all times herein, Hill has never asserted mental retardation as a defense to his malice murder conviction. Instead, Hill's mental retardation claim now and always has related to only his sentence.

## C. 1996 Amendment to First State Habeas–First Claim of Mental Retardation

In 1994, Hill filed in state court a petition for habeas corpus that did not make any mental retardation claim.

Two years later, in 1996, Hill amended his state habeas petition to allege, for the first time, that he was mentally retarded and his mental retardation barred his death sentence. The court ordered mental evaluations, conducted a lengthy evidentiary hearing, and heard extensive testimony from mental health experts who had conducted tests and reviewed Hill's school and medical records, his military and employment history, and voluminous other documents. The court also received affidavits as to his abilities from 59 friends and family members of Hill and heard testimony from Hill's trial counsel.

The state habeas court determined that Hill's evidence failed to prove he was mentally retarded. In doing so, it employed the definition of mental retardation in O.C.G.A. § 17-7-131(a)(3), which provides that "mentally retarded" means (1)

having "significantly subaverage general intellectual functioning," (2) "resulting in or associated with impairments in adaptive behavior," (3) "which manifested during the developmental period."  Georgia's definition essentially tracks the clinical definitions mentioned by the Supreme Court in Atkins v. Virginia, 536 U.S. 304, 308 n.3, 122 S. Ct. 2242, 2245 n.3 (2002).

As to the first prong, the state habeas court found Hill established beyond a reasonable doubt his "significantly subaverage general intellectual functioning."[1] While the court did not find an exact IQ score, psychologists had administered multiple tests, resulting in IQ scores ranging between 69 and 77.

As to the second prong of the mental retardation standard, however, the state habeas court found Hill had failed to show beyond a reasonable doubt that he had "impairments" in "adaptive behavior" such as "communication, self-care, home living, social/interpersonal skills, use of community resources, self direction, functional academic skills, work, leisure, health, and safety."  The court noted Hill's (1) extensive work history and "apparent ability to function well in such

---

[1]Before trial in 1991, clinical psychologist William Dickinson evaluated Hill using the Wechsler Adult Intelligence Scale, Revised ("WAIS-R") test.  Hill's full-scale IQ score on the WAIS-R was 77.  Dickinson also administered the Peabody Picture Vocabulary Test ("PPVT"), on which Hill earned an estimated IQ score of 74.  Records show Hill took the PPVT when he was in second grade and scored a 75.

In 1997, in Hill's state habeas proceedings, Dr. Daniel Grant evaluated Hill using the Stanford-Binet Intelligence Test, and Hill received an IQ score of 72.  In 2000, Dr. Jethro Toomer administered the Wechsler Adult Intelligence Scale III ("WAIS-III"), on which Hill earned a full-scale IQ score of 69.

In a 2000 affidavit, Dickinson opined that the 1991 WAIS-R overestimated Hill's IQ by 3-7 points; given Hill's original score of 77, this results in a range of 70 to 74.

employment," (2) disciplined savings plans pursued to purchase cars and motorcycles, (3) military service, (4) active social life, (5) writing skills, and (6) ability to care for himself.[2]

The state court based its conclusion, in part, on a 35-page report prepared by three mental health experts. One expert, Dr. Thomas H. Sachy, a psychiatrist, evaluated Hill on November 22, 2000. The other two experts, Dr. Donald W. Harris, a psychologist, and Dr. J. Gary Carter, a psychiatrist,[3] evaluated Hill together on December 6, 2000. Based on their in-person evaluations and the voluminous evidence of Hill's adequate "adaptive behavior," the experts determined that Hill was not mentally retarded and was malingering.

Among the evidence relied on by the experts and presented to the state habeas court, Hill's military record was particularly meaningful. He entered the military at the rank E-1 and, advancing each year, attained the rank of E-5 in five years.[4] Hill was decorated as a .38 caliber sharpshooter. He received military education in nuclear weapons loading, aviation fund school, and corrosion control. He completed an 80-hour instructor training course. Hill also attended and

---

[2]The state habeas court did not discuss the third prong of the mental retardation test, which is that the onset of it must have been before age 18.

[3]In 2000, Dr. Carter was the Clinical Director of Forensic Services at Central State Hospital.

[4]Hill was eligible for an E-6 promotion in the military; however, he was demoted not because of any mental inability, but because he murdered his girlfriend.

completed a 2-week military course in leadership management education and training. He was qualified as an assistant supervisor and ordnance systems maintenance man and troubleshooter, with collateral duties in shop training, as a publications petty officer, as a nuclear conventional weapons load team member, and as a corrosion control/reclamation and salvage team member. Hill was qualified as a weapons technician and was a Human Relations council member. He completed a 2-week tour with a hometown recruiting program, played on the football team, and was Petty Officer of the Watch. Hill also functioned as an assistant work center supervisor, an ordnance troubleshooter, was CPR qualified, and played on an intramural basketball team.

Evaluations of Hill during his military duty contain these descriptions of him:

> Dedicated and reliable petty officer. Completes all tasks expeditiously, at times under very adverse conditions. Quiet, friendly manner, and positive attitude greatly enhances squadron morale. Uniforms and appearance always outstanding. Actively supports the Navy's equal opportunity goals. Good use of the English language orally and written. Strongly recommended for advancement and retention.

Similarly, Hill was reported to be:

> [a] reliable individual and devoted second class petty officer. Works exceptionally well with others and assists in the training of weapons-loading team members. Implemented a new W/C tool control program and aided in the redesigning of the W/C technical Pubs library, both areas receiving an outstanding during the latest COMHEL WINGGRES visit. His quiet personality enhances

6

squadron morale.  Uniforms and appearance continually outstanding. Actively supports the Navy's equal opportunity goals.  Demonstrates excellent command of the English language orally and written. Strongly recommended for advancement and retention in the Naval service.

Based on all of the evidence, the state habeas court concluded that Hill had not shown impairments in adaptive behavior and thus had not established his mental retardation beyond a reasonable doubt.

The Georgia Supreme Court affirmed.  Head v. Hill, 277 Ga. 255, 587 S.E.2d 613 (2003).  In doing so, it upheld the state habeas court's findings and reasons for denying Hill's mental retardation claims.  See id. at 256–56, 587 S.E.2d at 617–18.

**D.  First Federal 28 U.S.C. § 2254 Petition–Filed October 5, 2004**

On October 5, 2004, Hill filed a 28 U.S.C. § 2254 petition for a writ of habeas corpus in the United States District Court for the Middle District of Georgia.  The petition raised multiple mental retardation claims involving Hill's death sentence, including a claim that because he had proved his mental retardation, the Eighth Amendment barred his execution.[5]  After extensive briefing on this and other issues, the district court denied relief on November 7, 2007.[6]

---

[5]Hill also argued that Georgia's standard of proof—beyond a reasonable doubt—was unconstitutional.

[6]On August 22, 2008, the district court denied Hill's timely filed Motion to Alter and Amend Judgment.

7

This Court granted a certificate of appealability on limited issues. Subsequently, this Court en banc affirmed the district court's denial of Hill's § 2254 petition. Hill v. Humphrey, 662 F.3d 1335 (11th Cir. 2011) (en banc). The United States Supreme Court denied certiorari. Hill v. Humphrey, 132 S. Ct. 2727 (June 4, 2012).

The State initially set Hill's execution for July 18, 2012 at 7:00 pm., but rescheduled it for July 23, 2012 at 7:00 pm.[7]

**E.  Second State Habeas–Filed July 18, 2012**

On July 18, 2012, shortly before his scheduled execution, Hill filed a successive state habeas petition reasserting the same mental retardation claim. On July 19, 2012, the state habeas court denied the claim. Hill appealed. On July 23, 2012, the Georgia Supreme Court found Hill's claim was barred from review by Georgia res judicata principles, holding:

> To the extent that Hill's petition for a writ of habeas [corpus] raised claims previously addressed by this Court in Hill's first state habeas proceedings, such claims are barred as res judicata. See Head v. Hill, 277 Ga. 255 (587 S.E. 613) (2003) . . . .

Hill v. Humphrey, Case No. S12W1799 (Ga. July 23, 2012) (unpublished order).

The United States Supreme Court denied certiorari as to the Georgia Supreme

---

[7]On June 16, 2012, the Georgia Board of Pardons and Paroles denied Hill's petition for clemency.

Court's denial of Hill's second state habeas petition. Hill v. Humphrey, No. 12-8048 (Feb. 19, 2013).

## F.  Lethal Injection Claims

Also during July 2012, Hill filed a separate civil action challenging the State's method of his lethal injection on various grounds.  On July 23, 2012, the state trial court rejected the lethal injection claim on the merits.  Hill appealed to the Georgia Supreme Court, and, on July 23, 2012, that court entered a stay of execution to allow for consideration of those lethal injection claims.  The Georgia Supreme Court granted a discretionary appeal, and later rejected Hill's lethal injection claims on the merits and vacated the stay.  Hill v. Owens, No. S12A1819, (Ga. Feb. 4, 2013).

## G.  Third State Habeas–Filed February 15, 2013

The State set Hill's execution for February 19, 2013 at 7:00 pm.

On February 15, 2013, Hill filed his third state habeas petition, this time asserting that certain prior mental health experts, including Dr. Thomas Sachy, had now modified their opinions about Hill's mental capabilities.  These mental health experts had not seen Hill since their evaluations in 2000 and had not administered any new tests to Hill.

Rather, as explained below, Hill's pleadings admit that Dr. Thomas Sachy, on his own, read about Hill's scheduled execution and contacted Hill's attorney on

9

July 27, 2012 to advise that his earlier 2000 conclusion in the state habeas court—

that Hill was not mentally retarded—may have been in error.  Dr. Sachy's affidavit

states:

> In late July 2012, I noticed media reports about a man whom courts
> had found to be mildly mentally retarded and who was nevertheless
> facing execution.  I then realized that this man was Warren Lee Hill,
> and I remembered that I had evaluated him for the government many
> years ago.  Not realizing that a stay of execution had already been
> entered in the case, I contacted Mr. Hill's counsel on July 27, 2012,
> and offered to discuss the case.  I told counsel I felt that my previous
> conclusions about Mr. Hill's mental health status were unreliable
> because of my lack of experience at the time, and I wanted to revisit
> the case.

Pet. for Writ of Habeas Corpus 12 (quoting Dr. Thomas Sachy Aff.).  Although Dr.

Sachy contacted Hill's attorney on July 27, 2012, Hill filed nothing regarding Dr.

Sachy's changing his opinion until February 15, 2013, right before his execution

scheduled for February 19, 2013.[8]

In response to Hill's third state habeas petition, the State pointed out that

Hill was again raising the same, multiple claims of mental retardation that were

previously adjudicated and denied by the state habeas courts and the Georgia

Supreme Court.  The State also stressed, among other things, that Hill's claims in

---

[8]Hill's attorney candidly acknowledges that Dr. Sachy contacted him in July 2012 "after
a temporary stay had been entered in his case" by the Georgia Supreme Court.  Hill's attorney
implies that he did not immediately seek affidavits from Dr. Sachy and the other experts because
he was concentrating on the lethal injection claims in July 2012 to February 2013 and "had no
knowledge as to when the Georgia Supreme Court would issue a decision in the case."

his third habeas petition remained barred under state law by Stevens v. Kemp, 254 Ga. 228, 327 S.E.2d 185 (1985).

On February 18, 2013, the state habeas court denied Hill's third habeas petition concluding that it was procedurally barred and that he had not shown a miscarriage of justice:

> This Court DISMISSES the instant action as procedurally barred as this is Petitioner's third state habeas petition in this Court asserting the same claims. Stevens v. Kemp, 254 Ga. 228, 230 (198[5]). This Court does not find Petitioner has cited any new law to overcome the bar. Further, Petitioner's "new evidence" does not establish a miscarriage of justice. Thus, the claims in this petition are barred by law from review. The instant petition is DISMISSED    and    this Court therefore DENIES Petitioner's motion for stay of his execution.

Hill v. Humphrey, Habeas Corpus Action (Butts Cnty., Ga. Super. Ct. Feb. 18, 2013) (unpublished order).

After the denial of his third state habeas petition, Hill sought a stay of execution and filed an application for a certificate of probable cause to appeal to the Georgia Supreme Court, which denied his application and request for a stay of execution.

## H.  Application to File Successive § 2254 Petition

On February 19, 2013, just three hours before the scheduled execution, Hill filed in this Court an Application for leave to file a successive federal § 2254 habeas petition. In support of his Application, Hill refers to the same recanted

11

evidence from the mental health experts on which he had based his third state habeas petition.

As he did in his third state habeas petition, Hill recounted how Dr. Thomas Sachy heard news reports about Hill's pending execution and contacted Hill's attorney on July 27, 2012.  Although he had not seen Hill since 2000, Dr. Sachy had revisited his notes from his 2000 evaluation and concluded that his previous assessment was wrong.  Hill filed Dr. Sachy's affidavit, dated February 8, 2013, which states that he has changed his 2000 opinion.  According to Dr. Sachy, his additional experience in practicing psychiatry since 2000 and new research studies by others caused him to conclude that: (1) Hill was not malingering during the 2000 evaluation; and (2) Hill's Naval records were "not inconsistent with mild mental retardation."

Hill also filed affidavits, dated February 11 and 12, 2013 respectively, by Drs. Donald Harris and James Gary Carter.  Dr. Harris, a psychologist, and Dr. Carter, a psychiatrist, both testified at the 2000 hearing that Hill was not mentally retarded.  They did so after jointly conducting a two-hour, in person evaluation.  In their 2013 affidavits, Drs. Harris and Carter each state they were contacted by Hill's attorney in February 2013 and informed of Dr. Sachy's new assessment.  They then reconsidered their 2000 opinions and now consider Hill mildly mentally

retarded.  Like Dr. Sachy, Drs. Harris and Carter had not administered any new tests to Hill or even seen him in 13 years.[9]

After Hill's Application was filed, this Court in an unpublished order granted a conditional stay of execution to permit further briefing by Hill, then the State, and then a reply by Hill.  That extensive briefing is now complete, and thus we proceed to rule on Hill's Application.

## II.  DISCUSSION

### A.  Strict Federal Restrictions on Successive Petitions

Hill seeks to file a successive petition for habeas corpus under 28 U.S.C. § 2254.  Because he already filed one § 2254 habeas petition, Hill must meet the strict requirements of 28 U.S.C. § 2244 before filing a successive federal habeas petition.  28 U.S.C. § 2244(b).

Section 2244 was enacted as part of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA").  "[O]ne of the principal functions of AEDPA was to ensure a greater degree of finality for convictions."  Gilbert v. United States, 640 F.3d 1293, 1310 (11th Cir. 2011) (en banc); see also Johnson v. United States, 340 F.3d 1219, 1224 (11th Cir. 2003); Jones v. United States, 304 F.3d 1035, 1039 (11th Cir. 2002) ("A fundamental purpose for the AEDPA was to

---

[9]Notably, Hill did not attach to his third state habeas petition, or to his instant Application, any affidavit prepared by a mental health expert who had evaluated him after December 2000.  Drs. Sachy, Harris, and Carter each base their revised opinions on reconsideration of their December 2000 evaluations.

13

establish finality in post-conviction proceedings."). The Supreme Court has instructed that AEDPA's purpose is to advance the principles of comity, finality, and federalism. Williams v. Taylor, 529 U.S. 420, 436, 120 S. Ct. 1479, 1490 (2000). As we have explained:

> The statutory bar against second or successive motions is one of the most important AEDPA safeguards for finality of judgment . . . . "The central purpose behind the AEDPA was to ensure greater finality of state and federal court judgments in criminal cases, and to that end its provisions greatly restrict the filing of second or successive petitions."

Gilbert, 640 F.3d at 1311 (quoting Gonzalez v. Sec'y for Dep't of Corrs., 366 F.3d 1253, 1269 (11th Cir. 2004) (en banc), aff'd on other grounds sub nom., Gonzalez v. Crosby, 545 U.S. 524, 125 S. Ct. 2641 (2005)); see also Tyler v. Cain, 533 U.S. 656, 661, 121 S. Ct. 2478, 2481–82 (2001) ("AEDPA greatly restricts the power of federal courts to award relief to state prisoners who file second or successive habeas corpus applications."). "If second and successive motions are not 'greatly restrict[ed],' there will be no end to collateral attacks on convictions and sentences, and there will be no finality of judgment." Gilbert, 640 F.3d at 1311 (quoting Tyler, 533 U.S. at 661, 121 S. Ct. at 2481).

One tool AEDPA uses to restrict successive petitions is the requirement that petitioners, like Hill, obtain permission from this Court before they can file a successive § 2254 petition in a district court. Specifically, § 2244(b)(3)(A) requires a state prisoner seeking to file a second or successive habeas petition to

move this Court "for an order authorizing the district court to consider the application."  28 U.S.C. § 2244(b)(3)(A).

**B.  28 U.S.C. § 2244(b)(1)**

In ruling on an application to file a successive petition, this Court must make a threshold determination of whether the claim to be presented in the second or successive petition was presented in the first petition.  We do that because § 2244(b)(1), added by AEDPA, provides that "[a] claim presented in a second or successive habeas corpus application under section 2254 that was presented in a prior application shall be dismissed."  28 U.S.C. § 2244(b)(1) (emphasis added).  It provides no exceptions.

As held by the Supreme Court, "[u]nder § 2244(b), the first step of analysis is to determine whether 'a claim presented in a second or successive habeas corpus application' was also 'presented in a prior application.'  If so, the claim must be dismissed; if not, the analysis proceeds to whether the claim satisfies one of two narrow exceptions."  Gonzalez, 545 U.S. at 530, 125 S. Ct. at 2647 (emphasis added); see also Tyler, 533 U.S. at 661–62, 121 S. Ct. at 2481–82; In re Lambrix, 624 F.3d 1355, 1362 (11th Cir. 2010) ("Because Claims 7, 8, and 10 were previously presented by Lambrix, they cannot be the basis of a claim for leave to file a successive habeas petition." (citing 28 U.S.C. § 2244(b)(1))); Gonzalez, 366

F.3d at 1269 (noting the "total ban on claims that were presented in a prior petition" (emphasis added)).

Here, Hill's first federal habeas petition in 2004 was a "prior application" for the purposes of § 2244(b)(1). It contained the same claim that Hill wants to raise in the successive petition he has applied to file. Therefore, we must deny Hill's Application and dismiss the claim. The statute does not say "may be dismissed," it says "shall be dismissed." 28 U.S.C. § 2244(b)(1).

More specifically, in his first federal habeas petition in 2004, Hill included the following claim as "Claim One": "Mr. Hill is mentally retarded, and his execution would violate the Eighth and Fourteenth Amendments to the United States Constitution." See Hill v. Schofield, No. 04-cv-00151-WLS, DE 2 at i ("Petition") (Table of Contents, stating that Claim One of the petition is that "Mr. Hill is mentally retarded, and his execution would violate the Eighth and Fourteenth Amendments to the United States Constitution."). [10] Hill's claims are then broken up into subparts. His first argument in part A of Claim One was that he had proven he was mentally retarded and thus could not be executed under the Eighth Amendment. Id. at i, 12–19. In part A of Claim One, Hill specifically argued that he met the diagnostic requirements of mental retardation, i.e., that he

---

[10] We attach a copy of the first page of the table of contents to Hill's first federal habeas petition as "Appendix A."

16

has significant defects in intellectual functioning and significant limitations in adaptive functioning.  In fact, he specifically argued that although the state habeas court found that he had not established significant adaptive deficits, the evidence showed to the contrary.  Id. at i, 17–19.[11]

As a separate argument in part C of Claim One, Hill also asserted that Georgia's statutory requirement that a defendant prove mental retardation beyond a reasonable doubt violated the Eighth and Fourteenth Amendments.  Id. at i, 25–32.  In his first federal habeas proceedings, Hill thoroughly litigated not only his mental retardation claim, but also his allegations concerning the constitutionality of Georgia's burden of proof for such mental retardation claims.

Likewise, in the current Application, Hill requests permission to file a second or successive § 2254 petition on the basis that he "cannot be executed due to his mental retardation."  Hill asserts that he "is mentally retarded . . . and must

---

[11]After several pages of explaining why the evidence showed that Hill met the criteria for mental retardation, the first federal habeas petition reads as follows:

> In its initial order, the habeas court held that Mr. Hill had "failed to show beyond a reasonable doubt that he possesses significant deficits in adaptive skills."  Order of May 2002 at 6.  The habeas court found that doubt existed because Mr. Hill had a "consistent work ethic" and extensive work history; was able to purchase vehicles; performed well in the military; dated girls; and wrote several letters to his counsel that were "grammatically lacking," but logical.  As stated above, these factors are not inconsistent with mental retardation nor do they preclude a diagnosis of mental retardation.  By relying upon such facts to establish "doubt," the habeas court fell into a common trap: the misconception that mildly mentally retarded persons cannot accomplish such things.

Petition at 17 (second emphasis added).  Indeed, from the very beginning, Hill has argued that he is "mentally retarded within the meaning of OCGA § 17-7-131 et seq.," which requires mental retardation to be proven beyond a reasonable doubt.

17

be protected from wrongful execution." Again, Hill asserts that, because he is mentally retarded, his execution would violate the Eighth Amendment to the United States Constitution, and the Supreme Court's decision in Atkins.

We fully recognize that Hill has now submitted new evidence to bolster these same mental retardation claims. In his initial state habeas proceedings, he presented a large volume of evidence, including school records, military records, multiple test results, and extensive testimony from experts, family members, and friends. Petition at i, 10–19. In the instant Application, he refers to the same supporting evidence, but seeks to bolster his claim by filing the new February 2013 affidavits of Drs. Sachy, Harris, and Carter recanting their earlier opinions.

Although he has some new evidence, Hill nevertheless asserts in his Application the same "federal basis of relief from the state court's judgment" he asserted in his first federal habeas petition—that he is mentally retarded and cannot be executed pursuant to the Eighth Amendment. See Gonzalez v. Crosby, 545 U.S. 524, 530, 125 S. Ct. 2641, 2647 (2005) (defining § 2244(b)(1)'s term "claim" as "an asserted federal basis for relief from a state court's judgment of conviction"). Hill cannot convert his previously asserted "claim" into a wholly new "claim" merely by coming forward with new supporting evidence or even new legal arguments. At an irreducible minimum, what Hill is asserting now is precisely the same thing that he asserted in his initial habeas petition—he is and

has always been mentally retarded and his execution would therefore violate the Eighth and Fourteenth Amendments of the United States Constitution under the Supreme Court's decision in Atkins.  Here, it is new evidence in support of the same claim; it is not the basis of a new claim.

Tellingly too, Hill does not cite any authority suggesting that new supporting evidence or a new legal argument can transform a previously asserted claim into a wholly new claim.  Rather, this Court and other circuits have repeatedly held that new evidence and new legal arguments in support of a prior claim are insufficient to create a new claim and avoid § 2244(b)(1)'s bar on successive petitions.

For example, in In re Mills, 101 F.3d 1369 (11th Cir. 1996), this Court held that new supporting evidence is insufficient to avoid § 2244(b)(1)'s scope.  There, a state prisoner's application to file a successive § 2254 petition alleged, inter alia, the State withheld information regarding the ways it induced its key trial witness to testify against petitioner.  Id. at 1371.  The state prisoner's first § 2254 petition alleged the State improperly coerced the trial witness to testify.  Id.  In his application to file a successive § 2254 petition, the state prisoner bolstered his coercion allegation by quoting from a recently obtained affidavit of the trial witness.  Id.  This Court denied the application because the claim, although supported by new evidence, was "presented in a prior petition."  Id.

19

Our sister circuits also have concluded that newly discovered factual support for a prior claim does not justify the filing of a successive § 2254 petition.  For example, in Felder v. McVicar, 113 F.3d 696 (7th Cir. 1997), the Seventh Circuit considered an application to file a successive § 2254 petition alleging ineffective assistance of trial counsel based on counsel's failure to interview two eyewitnesses who, according to the petitioner, had exculpatory information.  Id. at 697.  The state prisoner made the same claim in his first federal habeas petition; however, he voluntarily dismissed that petition when he was unable to obtain affidavits from the two eyewitnesses.  Id. at 697–98.  In support of his application to file a second petition, the state prisoner came forward with the eyewitness affidavits.  Id. at 698.  Nevertheless, the Seventh Circuit held that § 2244(b)(1) barred the application because the state prisoner had already asserted the ineffective assistance of counsel claim, albeit with a lot less evidence.  Id.  The court reasoned that while "[a] newly discovered factual basis for a claim may permit filing a successive petition raising a new claim, . . . it does not permit filing a successive petition raising the same claim that was presented in a previous petition."  Id. (internal citations omitted).

Similarly, a new legal argument, even one that may entitle a habeas petitioner to relief, does not make a prior "claim" a new "claim" for the purpose of § 2244(b)(1).  See, e.g., Thompson v. Nixon, 272 F.3d 1098, 1100–01 (8th Cir. 2001) (concluding that, where state prisoner's federal habeas petitions argued that

20

jury instructions violated the Due Process Clause, the Supreme Court's new Fiore v. White[12] decision supporting his argument did not "make his claim a new one"; instead "Fiore simply provide[d] a new argument . . . in support of the same due-process claim that [was] presented twice before.").[13]

Similarly, in Babbitt v. Woodford, 177 F.3d 744 (9th Cir. 1999), the Ninth Circuit denied a state prisoner's application to file a successive § 2254 petition because the petition was raising essentially the same claim raised before. Id. at 746, 748. The Ninth Circuit concluded that § 2244(b)(1) barred the state prisoner's federal habeas claim based on ineffective assistance of counsel because the state prisoner asserted an ineffective assistance of counsel claim in a prior federal habeas petition. Id. at 746. It did not matter to the Ninth Circuit that the petitioner previously based his claim on his attorney's alleged failure to raise post-traumatic stress disorder as an affirmative defense at trial or as a mitigating factor at sentencing, whereas he later based his claim on new factual allegations of his attorney's ineffectiveness, including his attorney's alleged alcohol use during trial.

---

[12]531 U.S. 225, 121 S. Ct. 712 (2001).

[13]In Thompson, the state prisoner did not file a § 2244(b)(3)(A) application, but filed a motion asking the Eighth Circuit to recall its mandate denying his § 2254 petition. 272 F.3d at 1099. Specifically, the state prisoner argued that the Supreme Court's decision in Fiore, issued after the Eighth Circuit's mandate, established that the trial court's jury instructions in his case violated the Due Process Clause of the Fourteenth Amendment. Id. at 1099. The Eighth Circuit declined to recall the mandate, concluding that the state prisoner's claims in support of his motion to recall the mandate were successive and thus subject to § 2244(b)(1). Id.

Id. This was because "the basic thrust or gravamen of [the petitioner's] legal claim [was] the same . . . ." Id. (internal quotation marks omitted)[14]

These cases are instructive. Hill suggests that because he has new evidence to support his claim—the affidavits of Drs. Sachy, Harris, and Carter—his present mental retardation claim is new. But in Mills, this Court held that new evidence does not constitute a new claim. See 101 F.3d at 1371. Hill also reasons that because he no longer raises the burden of proof issue, his Eighth Amendment-mental retardation claim is new. Hill's argument seems to be that he now claims he is mentally retarded beyond a reasonable doubt, whereas he asserts that previously he only claimed he was mentally retarded by a preponderance of the evidence and that Georgia's higher standard was unconstitutional. However, Hill's burden of proof argument was only one subpart (part C) of his Eighth Amendment claim. Hill now is merely offering new evidence or a new legal argument in support of the same Eighth Amendment claim—that his mental retardation bars his execution under the Eighth Amendment—that we previously rejected. See Thompson, 272 F.3d at 1100–01. The core factual allegation remains that Hill is mentally retarded, and the core legal basis for the claim remains that his execution

_____

[14]Similarly, in Cooper v. Brown, 510 F.3d 870 (9th Cir. 2007), the Ninth Circuit concluded that "[a] claim is not newly presented merely because the petitioner offers new factual bases in support of a legal claim that has already been raised." Id. at 918 (emphasis added). That is exactly what Hill has done here. He has come forward with additional proofs in support of the same core claim—namely, that he is mentally retarded and that therefore his execution would violate the Eighth and Fourteenth Amendments.

22

would violate the Eighth and Fourteenth Amendments under Atkins. "[T]he basic thrust or gravamen of [Hill's] legal argument is the same . . . ." See Babbitt, 177 F.3d at 746 (internal quotation marks omitted). The burden of proof issue does not alter the core mental retardation claim.

Not only does precedent dictate our conclusion, so too do reason and the finality interests underlying AEDPA. If all that was required to reassert years later a previously rejected claim was a change in testimony, every material witness would have the power to upset every notion of finality by simply changing his testimony. And, as this case illustrates, opinion testimony can be changed with great ease (indeed, even without seeing Hill in 13 years, administering any new tests, or reviewing new documents, three witnesses pivoted their positions 180 degrees). Moreover, there is no reason to limit the change in evidence theory to changes in testimony of previous witnesses. New witnesses could be rounded up, and every new witness would transform the same old claim into a brand new one. There is no good reason to read "claim" as used in § 2244(b)(1) unnaturally to mean "new evidence supporting the claim" or a "new argument supporting the claim."

And there is every reason not to read it in that unnatural way. When it enacted AEDPA, Congress sought to bolster or add to the then-existing limitations on judicial power to grant habeas relief. See Tyler v. Cain, 533 U.S. 656, 661, 121

S. Ct. 2478, 2481–82 (2001) ("AEDPA greatly restricts the power of federal courts to award relief to state prisoners who file second or successive habeas corpus applications."); Stewart v. United States, 646 F.3d 856, 860 (11th Cir. 2011) (referencing "Congress's clear intention to limit 'second or successive' attempts at post-conviction relief").

Permitting a second or successive petition to be filed whenever expert witnesses decide to change their earlier opinions would not "greatly restrict[] the power of federal courts" to entertain second or successive petitions, Tyler, 533 U.S. at 661, 121 S. Ct. at 2481, but instead would have exactly the opposite effect—permitting second or successive petitions where pre-AEDPA law would not have. That is why in § 2244(b)(1), "claim" means claim, not evidence or arguments supporting a claim. And that is why the Supreme Court has instructed us that "[i]f the prisoner asserts a claim that he has already presented in a previous federal habeas petition, the claim must be dismissed in all cases." Tyler, 533 U.S. at 661, 121 S. Ct. at 2482 (citing 28 U.S.C. § 2244(b)(1)). "In all cases" means all cases. Section 2244(b)(1) bars the petition Hill requests authorization to file.

## C.  28 U.S.C. § 2244(b)(2)

Alternatively, even if we did view Hill's present claim as a new one that he did not present in his prior federal petition, we are nevertheless required to deny

24

his Application to file a successive petition because he has not satisfied the requirements of 28 U.S.C. § 2244(b)(2).

Under AEDPA, this Court may now grant authorization to file a successive federal habeas petition only if the applicant satisfies one of the two narrow statutory exceptions in § 2244(b)(2), stated as:

> (A) the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and
>
> (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2244(b)(2) (emphasis added). This Court "may authorize the filing of a second or successive application only if it determines that the application makes a prima facie showing that the application satisfies the requirements of this subsection [§ 2244(b)]." Id. § 2244(b)(3)(C). A prima facie showing is "a sufficient showing of possible merit to warrant a fuller exploration by the district court." In re Turner, 637 F.3d 1200, 1204 (11th Cir. 2011) (internal quotation marks omitted).

Hill's Application does not meet either of the two narrow exceptions enunciated in § 2244(b)(2). As to the first exception, Hill concedes that he does

25

not rely on a new rule of constitutional law that was previously unavailable. Indeed, under Georgia law, Hill had a right to raise his mental retardation claim at trial and his state habeas cases long before the Supreme Court's decision in Atkins v. Virginia, 536 U.S. 304, 122 S. Ct. 2242 (2002). And, as outlined above, Hill has already raised the mental retardation issue multiple times in state and federal courts, and all of those courts have rejected his claims. See Hill v. Humphrey, 662 F.3d 1335, 1340–43 (11th Cir. 2011) (en banc) (outlining procedural history of case). And, in any event, the Supreme Court decided Atkins in 2002, well before Hill filed his first federal habeas petition in 2004. Hill's Atkins claims were not only available to him, but were pleaded by him and rejected before in both state and federal courts.

As to the second exception in § 2244(b)(2)(B) concerning newly discovered evidence of actual innocence, Hill has failed to satisfy that exception too. Even assuming arguendo Hill has shown due diligence, the new evidence (i.e., the recanted expert opinions) does not establish that, "but for constitutional error, no reasonable factfinder would have found [Hill] guilty of the underlying offense." See 28 U.S.C. § 2244(b)(2)(B)(ii) (emphasis added).[15] Again, because the purpose

---

[15]The State vigorously argues that Hill has not come close to showing that the factual predicate could not have been discovered previously through due diligence because: (1) the experts based their change of their staunchly held opinions on supposedly "new advancements" in assessing adaptive deficits, but (2) those alleged advancements are not new and were available to Hill and the experts in 2000 at the time of the first state habeas hearing.

26

of AEDPA is to greatly restrict the power of federal courts to entertain second or successive petitions, the Supreme Court has made clear that this is a "narrow exception[]" for claims "that call into question the accuracy of a guilty verdict." Tyler, 533 U.S. at 661–62 (emphasis added).

Hill has not pointed to any newly discovered facts that establish, or even could possibly establish, his innocence of the underlying offense of murder. To the contrary, Hill has never denied that he was guilty of intentionally murdering his fellow inmate, and even now he does not challenge his murder conviction. Hill's claim is a pure sentencing claim. His claim is that under Atkins, he cannot be executed because he is mentally retarded. But Atkins had nothing to do with convictions. Hill's "underlying offense" within the meaning of § 2244(b)(2)(B)(ii) is murder, not a death sentence. As the Georgia Supreme Court described it, "Warren Lee Hill was convicted of murder by a jury in Lee County and sentenced to death." Hill v. State, 263 Ga. 37, 37, 427 S.E.2d 770, 772 (1993). His conviction was for the offense of murder; his sentence, based on the aggravating

---

The State also points out that the experts allege that they did not have, in 2000, the information that Hill could have served in the Navy as a mentally retarded individual, but that the record shows the experts had Hill's military records, reviewed them prior to their 2000 testimony, and found they undermined Hill's claim of mental retardation. According to the State, the experts also reviewed the affidavits of Dr. Garrett Duckworth and Chief Warren O'Bryant prior to the 2000 state habeas and those affidavits are consistent with the testimony of Drs. Stonefield and Brittain regarding serving in the military if mentally retarded. Thus, the State emphasizes that the basis for the experts' change of opinion was already available before their 2000 testimony. We ultimately need not reach this due diligence issue given our other rulings above.

27

and mitigating circumstances that were established at the later sentencing hearing, was death.  A sentence is not a conviction for an "underlying offense."  See 28 U.S.C. § 2244(b)(2)(B)(ii).

Importantly here, the language of "guilty of the underlying offense" is plain and unambiguous.  "Indeed, '[t]he first rule in statutory construction is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute.  If the statute's meaning is plain and unambiguous, there is no need for further inquiry.'"  In re Davis, 565 F.3d 810, 823 (11th Cir. 2009) (quoting United States v. Silva, 443 F.3d 795, 797–98 (11th Cir. 2006)).  "Put differently, we 'must presume that Congress said what it meant and meant what it said.'"  Davis, 565 F.3d at 823 (quoting Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1167 (11th Cir. 2003)).

The first term that Hill cannot overcome is the word "guilty."  "Guilty" means "[h]aving committed a crime" or "responsible for a crime."  Black's Law Dictionary 776 (9th ed. 2009); see also Webster's Third New International Dictionary Unabridged 1009–1010 (2002) (defining "guilt" as "responsibility for an offense" or "the fact of having committed a breach of conduct esp. violating law").  Hill's Atkins claim, regardless of his new evidence, does not call into

28

question the fact that he committed the crime of murder, nor does it controvert his responsibility for that act. Hill remains <u>guilty</u> of the "underlying" crime.[16]

The statutory use of the word "underlying" is also significant, drawing further contrast between the offense of conviction and the ensuing sentence. If "guilty of the underlying offense" is read to cover sentencing claims as well, then the word "underlying" is rendered utterly superfluous. See <u>Dole Food Co. v. Patrickson</u>, 538 U.S. 468, 476–77 (2003) ("Absent a statutory text or structure that requires us to depart from normal rules of construction, we should not construe the statute in a manner that is strained and, at the same time, would render a statutory term superfluous."). When you combine the term "guilty" with the word "underlying," it is clear that the statute sharply distinguishes between a petitioner's offense of conviction and his sentence. We are unable to transmute a claim that a petitioner is not eligible for a capital sentence into a claim that the petitioner is not "guilty of the underlying offense."

---

[16]Hill points out that the Georgia statutory scheme requires that a defendant be both guilty and not mentally retarded before receiving a death sentence. This argument cuts <u>against</u> him. It demonstrates that the concepts of guilt and mental retardation are distinct and independent; that is, Hill can be found guilty of murder in Georgia and yet still be mentally retarded. <u>See</u> O.C.G.A. § 17-7-131(c) (providing for verdict of "guilty but mentally retarded"). In other words, what the statute does is prohibit a death sentence, <u>not</u> a verdict of guilt. <u>Id.</u> § 17-7-131(j) ("In the trial of any case in which the death penalty is sought . . . , should the judge find in accepting a plea of guilty but mentally retarded or the jury or court find in its verdict that the defendant is <u>guilty of the crime charged</u> but mentally retarded, the death penalty shall not be imposed and the court shall sentence the defendant to imprisonment for life." (emphasis added)).

Given the plain and unambiguous language in the statute, this Court repeatedly has held that federal law does not authorize the filing of a successive application under § 2244(b)(2)(B) based on a sentencing claim even in death cases. In re Schwab, 531 F.3d 1365, 1366–67 (11th Cir. 2008) (denying a death row inmate's application for a successive habeas petition premised on a change of expert opinion purporting to establish the inmate's "innocen[ce] of the death penalty," because (1) the inmate's application did not assert "a constitutional error, just a change in the opinion of an expert witness," and (2) "the asserted change in opinion [went] to the existence of mitigating circumstances, not to whether [the inmate was] guilty of the underlying offense"); In re Diaz, 471 F.3d 1262, 1263–64 (11th Cir. 2006) (per curiam) ("Because [Petitioner] does not, and could not, suggest that the alleged new evidence would have altered the jury finding on his guilt of the underlying offense, he is not eligible for relief under the second exception."); In re Provenzano, 215 F.3d 1233, 1237 (11th Cir. 2000) ("[Petitioner's] innocence-of-the-death-penalty claim does not fit within either § 2244(b)(2) exception."); In re Jones, 137 F.3d 1271, 1273-74 (11th Cir. 1998) (denying an application to file a second or successive habeas petition on a claim that execution by electric chair violates the Eighth Amendment, because the newly discovered evidence exception in § 2244(b)(2)(B) does not apply to sentence-related claims); In re Medina, 109 F.3d 1556, 1565 (11th Cir. 1997) ("[T]he plain

30

terms of [the] exception make it clear that it is limited to claims going to whether the applicant is 'guilty of the underlying offense.'"), overruled on other grounds by Stewart v. Martinez-Villareal, 523 U.S. 637, 118 S. Ct. 1618 (1998); see also In re Schwab, 506 F.3d 1369, 1370 (11th Cir. 2007) (denying a death row inmate's application to file a second or successive habeas petition because it neither relied on a new rule of constitutional law, "nor involve[d] facts relating to guilt or innocence").[17]  Hill essentially concedes our Court's holding in In re Medina is against him.

Notably too, the Fifth Circuit has construed similar plain language in 28 U.S.C. § 2255(h)—"guilty of the offense"—as not applying to sentences and not allowing the filing of a successive § 2255(h) motion where the movant claimed he was "not guilty of the death penalty" or "not eligible for a death sentence."  See In re Webster, 605 F.3d 256, 258–59 (5th Cir. 2010).  Section 2255(h)(1) provides that

> [a] second or successive motion must be certified as provided in section 2244 by a panel of the appropriate court of appeals to contain . . . newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense . . . .

---

[17]In Ward v. Hall, 592 F.3d 1144 (11th Cir. 2010), this Court held that similar language in 28 U.S.C. § 2254(e)(2), authorizing federal evidentiary hearings, did "not apply to issues relating to the sentencing phase of a trial." Id. at 1161.  We construed "guilt of the underlying offense" to mean exactly what it says and nothing else.  See id.

31

28 U.S.C. § 2255(h)(1) (emphasis added).  The movant in Webster urged the Fifth

Circuit "to read 'offense' broadly so that § 2255(h)(1) would cover not only a

claim that a prisoner is not guilty of the offense of conviction, but also a claim that

he is 'not guilty of the death penalty.'"  605 F.3d at 258.

Rejecting that argument and denying Webster's application to file a

successive § 2255(h) motion, the Fifth Circuit stressed three points.  First, "there is

no reason to believe that Congress intended the language 'guilty of the offense' to

mean 'eligible for a death sentence.'"  Id. (quoting 28 U.S.C. § 2255(h)(1)).

Secondly, "[h]ad Congress wanted the provision to cover challenges to a

sentence—even if only to a death sentence—it easily could have referenced

sentences explicitly in the text . . . ."  Id.  Third, Congress "elected to couch

§ 2255(h)(1), as well as § 2244(b)(2)(B)(ii), in the markedly different,

unmistakable terms of guilt of the offense."  Id. at 259; see also Hope v. United

States, 108 F.3d 119, 120 (7th Cir. 1997) ("We conclude that a successive motion

under 28 U.S.C. § 2255 (and presumably a successive petition for habeas corpus

under section 2254, governing habeas corpus for state prisoners, which has

materially identical language) may not be filed on the basis of newly discovered

evidence unless the motion challenges the conviction and not merely the

sentence."); cf. Wright v. Angelone, 151 F.3d 151, 164 n.8 (4th Cir. 1998) (dicta)

(noting in a procedural default case under 28 U.S.C. § 2254(e)(2)(B), that "other

circuit courts narrowly have interpreted the identical language in § 2244(b)(2) to require that habeas petitioners demonstrate actual innocence of the underlying crime to file a successive habeas petition on the basis of newly discovered evidence[,]" and thus, "[a] claim of 'innocence of the death penalty' only is no longer sufficient to warrant review").[18]

In sum, as this Court held, "'Our function is to apply statutes, to carry out the expression of the legislative will that is embodied in them, not to 'improve' statutes by altering them.'" Davis, 565 F.3d at 823 (quoting Wright v. Sec'y for the Dep't of Corrs., 278 F.3d 1245, 1255 (11th Cir. 2002)). As the statute in § 2244(b)(3)(C) makes clear, this Court may authorize the filing of a successive petition only if Hill's Application makes a prima facie showing that the proposed petition satisfies one of the narrow exceptions in § 2244(b)(2). Even if § 2244(b)(1) did not bar Hill's attempt to file a second or successive petition, he has not, and cannot, meet the statutory requirements in § 2244(b)(2) for authorization to file one. Therefore, this Court is not authorized to grant Hill permission to file a successive federal habeas petition.

Finally, we have considered with care and caution our colleague's dissent. We are required, however, to apply the rules of AEDPA and, more particularly, the

---

[18]But see Thompson v. Calderon, 151 F.3d 918, 923–24 (9th Cir. 1998) (en banc) (holding that petitioner's "claim that he is ineligible for the death penalty due to the constitutional infirmity of [his] . . . conviction . . . states a claim under § 2244(b)").

stringent rules found in § 2244(b)(1) and (b)(2) that Congress has enacted regarding second or successive petitions.  The unequivocal and plain text compels this result.

## D.  Sawyer Exception Does Not Survive AEDPA

Given that Hill's sentence claim does not fall within the § 2244(b)(2)(B) exception, we note that Hill also asks us to grant equitable relief by applying a pre-AEDPA exception to the bar on successive habeas petitions.  Our precedent and AEDPA's plain terms also foreclose that request too.

Hill relies primarily on the pre-AEDPA decision in Sawyer v. Whitley, 505 U.S. 333, 112 S. Ct. 2514 (1992), where the Supreme Court considered an exception to the judicially-developed bar on second or successive habeas petitions. Id. at 346–47, 112 S. Ct. at 2523.  Prior to AEDPA, Supreme Court decisions barred second or successive habeas petitions unless the petitioner could establish cause and prejudice or a miscarriage of justice.  Id. at 338, 112 S. Ct. at 2518.  To prove a miscarriage of justice, a petitioner had to show actual (factual) innocence. Id. at 339, 112 S. Ct. at 2518–19.

In Sawyer, the Supreme Court held that the "actual innocence" exception applied to claims asserting innocence of facts underlying a petitioner's eligibility for capital sentencing.  Id. at 346–47, 112 S. Ct. at 2523.  To bring a claim within the miscarriage of justice exception to the bar on successive habeas petitions, the

Supreme Court required a petitioner to present evidence establishing "a fair probability that a rational trier of fact would have entertained a reasonable doubt as to the existence of those facts which are prerequisites under state or federal law for the imposition of the death penalty." Id. at 346, 112 S. Ct. at 2523 (internal quotation marks omitted).

The pre-AEDPA bar on successive habeas petitions was judge-made. So too were its exceptions. When it enacted AEDPA, Congress codified the bar on successive habeas petitions, but not any pre-AEDPA exceptions. In their place, Congress crafted narrow exceptions. The Supreme Court has recognized that the pre-AEDPA Sawyer exception did not survive the plain language of § 2244(b)(2). It has explained:

> AEDPA greatly restricts the power of federal courts to award relief to state prisoners who file second or successive habeas corpus applications. If the prisoner asserts a claim that he has already presented in a previous federal habeas petition, the claim must be dismissed in all cases. § 2244(b)(1). And if the prisoner asserts a claim that was not presented in a previous petition, the claim must be dismissed unless it falls within one of two narrow exceptions. One of these exceptions is for claims predicated on newly discovered facts that call into question the accuracy of a guilty verdict. § 2244(b)(2)(B). The other is for certain claims relying on new rules of constitutional law. § 2244(b)(2)(A).

Tyler, 533 U.S. at 661–62, 121 S. Ct. at 2481–82 (emphasis added). The Supreme Court has said there are only two narrow statutory exceptions, not that there are three exceptions—the two in the statute plus a third one that existed before the

35

statute was enacted.  Simply put, the <u>Sawyer</u> exception for actual innocence of the death penalty is not among the exceptions Congress chose to enact.  <u>See</u> 28 U.S.C. § 2244(b)(2).

This Court, en banc, has already held that Congress's failure to codify the <u>Sawyer</u> exception was meaningful and that the <u>Sawyer</u> exception does not survive AEDPA.  <u>See</u> <u>Gilbert</u>, 640 F.3d at 1322.  In <u>Gilbert</u>, a § 2255 movant attempted to take advantage of the <u>Sawyer</u> exception to obtain relief from his sentence.  We gave a number of independently alternative reasons for not applying that exception in his case.  <u>Id.</u> at 1320–23.  One of the reasons was that the <u>Sawyer</u> exception did not survive the enactment of AEDPA.  <u>Id.</u> at 1322.  We quoted at length and with approval the Seventh Circuit's decision in <u>Hope v. United States</u>, 108 F.3d 119 (7th Cir. 1997), which held that the "judge-fashioned" <u>Sawyer</u> exception does not survive AEDPA because "[t]he exception[s] in the new law [are] graven in statutory language that could not be any clearer."  <u>Hope</u>, 108 F.3d at 120.  Then we adopted that holding as our own.  <u>Gilbert</u>, 640 F.3d at 1322 ("In other words, <u>the actual innocence of sentence exception to the bar against second or successive motions involving sentence claims, as narrow as it was, did not survive AEDPA.</u>

36

For all of these reasons we conclude that the Sawyer actual innocence of sentence exception does not apply . . . ." (emphasis added)).[19]

We acknowledge that Gilbert dealt with a § 2255 motion based on an erroneous application of the United States Sentencing Guidelines, not a § 2254 habeas petition challenging a state death sentence.  However, in Gilbert, this Court did not suggest that the Sawyer exception remains viable in some circumstances not present in that case.  Rather, this Court made clear that AEDPA forecloses the Sawyer exception in all circumstances, including § 2254 challenges to state death sentences.  Gilbert, 640 F.3d at 1322.

This holding of the en banc court in Gilbert is consistent with our decisions in Schwab, Diaz, Provenzano, Jones, and Medina.  Each of those cases involved challenges to state death sentences.  Yet in none of them did we apply the Sawyer exception, although the exception might have been relevant under pre-AEDPA law.  To the extent that our precedent was previously unclear, we now clarify it—post-AEDPA, there is no Sawyer exception to the bar on second or successive habeas corpus petitions for claims asserting "actual innocence of the death

---

[19]The Fifth Circuit has also followed Hope's conclusion that the Sawyer exception did not survive the AEDPA amendment in § 2255(h).  See Webster, 605 F.3d at 258.

37

penalty."[20]  Thus, this Court is not authorized to grant Hill's Application on this basis either.

### III.  CONCLUSION

For all of these reasons, we **DENY** Hill's Application under 28 U.S.C. § 2244(b)(3)(A) for permission to file a second or successive petition for writ of habeas corpus in the district court.  We also **VACATE** the conditional stay of execution entered on February 19, 2013.

**APPLICATION DENIED; STAY VACATED.**

---

[20]Hill does not argue that our failure to recognize the Sawyer exception to § 2244(b)(2) results in a suspension of the writ of habeas corpus in violation of Article I, Section 9, Clause 2 of the United States Constitution.  Nevertheless, we make clear that our decision does not leave Hill without the ability to petition for a writ of habeas corpus.  Hill may petition the Supreme Court directly for a writ of habeas corpus under that Court's original jurisdiction.  See Felker v. Turpin, 518 U.S. 651, 661–63, 116 S. Ct. 2333, 2338–39 (1996) (holding that AEDPA did not withdraw from the Supreme Court its original jurisdiction to consider petitions for writs of habeas corpus and leaving open the question whether AEDPA's restrictions apply to federal habeas petitions brought under the Supreme Court's original jurisdiction); In re Davis, 565 F.3d 810, 826–27 (11th Cir. 2009) ("The Supreme Court has made clear that the habeas corpus statute, even after the AEDPA amendments of 1996, continues to allow it to grant a writ of habeas corpus filed pursuant to its original jurisdiction.").  Because Hill has an alternative avenue for habeas relief available to him, any argument that the writ has been suspended in his case would be a non-starter.

BARKETT, Circuit Judge, dissenting:

The Supreme Court has said unequivocally that it is a violation of the Eighth Amendment to the U.S. Constitution to execute a mentally retarded person. Atkins v. Virginia, 536 U.S. 304 (2002). Despite the Supreme Court's command "that such punishment is excessive and that the Constitution 'places a substantive restriction on the State's power to take the life' of a mentally retarded offender," Atkins, 536 U.S. at 321 (quoting Ford v. Wainwright, 477 U.S. 399, 405 (1986)), the state of Georgia will execute a mentally retarded man when it carries out the execution of Warren Lee Hill. There is no question that Georgia will be executing a mentally retarded man because all seven mental health experts who have ever evaluated Hill, both the State's and Hill's, now unanimously agree that he is mentally retarded.[1]

The state of Georgia and the majority, however, take the position that a federal court cannot consider Hill's newly discovered and compelling evidence because Congress's gatekeeping rules under AEDPA preclude us from allowing a

---

[1] In referring to "mental retardation" throughout this dissent, I recognize that increasingly professionals in this field, such as the American Association on Intellectual and Developmental Disabilities (formerly the American Association on Mental Retardation), are replacing the term "mental retardation" with "intellectual disability" or "intellectual developmental disability." In this dissent, however, I use the term "mental retardation" to maintain consistency with the terminology used throughout Hill's appeal and relevant caselaw.

As I noted in my dissent in Hill v. Humphrey, 662 F.3d 1335, 1366-67 (11th Cir. 2011) (en banc) (Barkett, J., dissenting), "the Supreme Court recognized [in Atkins] that mental retardation spans a spectrum of intellectual impairment, ranging from mild to moderate to severe to profound mental retardation," and that "within the universe of all mentally retarded individuals, 89% fall in the mildly mentally retarded range."

mentally retarded person to vindicate his constitutional right to never be put to death. The perverse consequence of such an application of AEDPA is that a federal court must acquiesce to, even condone, a state's insistence on carrying out the unconstitutional execution of a mentally retarded person. When Hill has proffered uncontroverted evidence of his mental retardation, I cannot agree that we have no choice but to execute him anyway because his claim does "not fit neatly into the narrow procedural confines delimited by AEDPA," In re Davis, 565 F.3d 810, 827 (11th Cir. 2009) (Barkett, J., dissenting).

The idea that courts are not permitted to acknowledge that a mistake has been made which would bar an execution is quite incredible for a country that not only prides itself on having the quintessential system of justice but attempts to export it to the world as a model of fairness. Just as we have recognized that a petitioner who "in fact has a freestanding actual innocence claim . . . would be entitled to have all his procedural defaults excused as a matter of course under the fundamental miscarriage of justice exception," Mize v. Hall, 532 F.3d 1184, 1195 n.9 (11th Cir. 2008), I see no reason not to accord the same consideration to one who has a freestanding claim that he is, in fact and in law, categorically exempt from execution.

## I.

The basis for Hill's present request for relief from his sentence of death is that all three experts who previously testified for the state of Georgia in 2000 that Hill did not meet the criteria for mental retardation have recently come forward and said they made a grievous mistake. They explained that their earlier conclusions were unreliable and that it is now their professional opinion that Hill is mentally retarded. For example, Dr. Thomas H. Sachy, who initiated contact with Hill's attorney after reading about the then impending execution, said he believed his original "conclusions about Mr. Hill's mental health status were unreliable because of [his] lack of experience at the time." Moreover, he noted that he had only spent approximately an hour with Hill the day before the hearing on Hill's mental status, that he did not have experience evaluating mental retardation, and that Hill's case constituted one of his first death penalty cases. After reviewing his earlier evaluation and substantial other materials in this case, Dr. Sachy now states:

> I believe that my judgment that Mr. Hill did not meet the criteria for mild mental retardation was in error. In my opinion today, within a reasonable degree of scientific certainty, Mr. Hill has significantly subaverage intellectual functioning with an IQ of approximately 70, associated with significant deficits in adaptive skills, with onset prior to age 18. I thus concur with the conclusions (rendered previously in Mr. Hill's case) of Dr. Daniel Grant, Dr. Jethro Toomer, Dr. Donald Stonefeld, and Dr. William Dickinson that Mr. Hill meets the criteria for mild mental retardation and the bases for those conclusions which they articulated.

Dr. Thomas H. Sachy, at ¶ 6 (Feb. 8, 2013).[2]  Not only did Dr. Sachy conclude that it is his professional opinion now that Hill is mentally retarded, but he also explained why he previously erred in concluding otherwise.

> In 2000, my erroneous judgment that Mr. Hill was deliberately feigning a disorder, as well as the narrow scope of information I reviewed, resulted in my error in finding that Mr. Hill was not mentally retarded. However, having learned about and revisited the issues of malingering and mental retardation and having reviewed extensive additional materials from the court record in Mr. Hill's case, my conclusion now, to a reasonable degree of scientific certainty, is that Mr. Hill meets the criteria for mild mental retardation as set out in the DSM-IV-TR and as delineated by the American Association on Intellectual and Developmental Disabilities (AAIDD).

Id. at ¶ 18.  Dr. Donald W. Harris and Dr. James Gary Carter likewise have attested that their earlier conclusions about Hill were wrong and that they now believe to a reasonable degree of scientific certainty that Hill is mildly mentally retarded. Accordingly, every expert who has ever evaluated Hill for mental retardation believes that he is mentally retarded.

But until Dr. Sachy contacted Hill's attorneys in July 2012, Hill lacked the factual basis to meet Georgia's stringent (and, in my opinion, unconstitutional) beyond a reasonable doubt burden of proof for mental retardation.  See Hill, 662 F.3d at 1365 (Barkett, J., dissenting) ("Requiring proof beyond a reasonable doubt, when applied to the highly subjective determination of mental retardation, eviscerates the Eighth Amendment constitutional right of all mentally retarded

_____

[2] I have attached a copy of Dr. Sachy's affidavit as "Appendix B."

42

offenders not to be executed."). Because some disagreement previously existed among the seven experts about Hill's mental retardation, this court held that he could not meet that stringent burden. See id. at 1374–75 (Barkett, J., dissenting) ("Thus, although the state habeas court ultimately found that Hill was probably mentally retarded, it was precluded from granting Atkins relief because Georgia limited this constitutionally guaranteed right to only those individuals who could establish mental retardation beyond any reasonable doubt, a standard that cannot be met when experts are able to formulate even the slightest basis for disagreement.").

Now, given the unanimity of all experts that Hill is mentally retarded, he can prove his mental retardation beyond a reasonable doubt and, thus, conclusively establish that his execution would be unconstitutional, even under Georgia's unreasonable standard. The majority minimizes the compelling testimony of these three experts as mere recantations, failing to acknowledge the very unusual circumstance of medical professionals unequivocally reversing their prior diagnoses and concluding that to a reasonable degree of medical certainty that Hill is mentally retarded. These experts not only have asserted that their prior testimony was unreliable but now have affirmatively stated that Hill is mentally retarded. Under these extraordinary circumstances, a statute, even if directly applicable, cannot trump the Eighth Amendment's constitutional mandate.

Hill is within one of three discrete classes of individuals, namely the insane,[3] the mentally retarded,[4] and juvenile offenders,[5] whom the Supreme Court has categorically protected from execution because individuals in these categories inherently lack the degree of culpability necessary to insure that the administration of the death penalty does not violate the prohibition against cruel and unusual punishments under the Eighth Amendment.  By categorically exempting these classes of persons from the death penalty, the Supreme Court has "vindicate[d] the underlying principle that the death penalty is reserved for a narrow category of crimes and offenders."  Roper, 543 U.S. at 568–69 (quoting Atkins, 536 U.S. at 319).  This principle was critical to the Supreme Court's reauthorization of the death penalty in 1976, at which time the Court made clear that the death penalty could only be used, without violating the Constitution, if it was reserved for the most atrocious murders committed by the most heinous of murderers so as to protect against its previous arbitrary and disproportionate application.[6]  See Gregg

---

[3] Ford, 477 U.S. at 405.

[4] Atkins, 536 U.S. at 321.

[5] Roper v. Simmons, 543 U.S. 551 (2005).

[6] When the Supreme Court four years earlier halted the use of the death penalty, several of the Court's justices expressed concern that the unfettered discretion judges or juries had in imposing capital punishment disproportionately resulted in the poor, sick, uneducated and unpopular members of society being sentenced to death.  See Furman v. Georgia, 408 U.S. 238 (1972).  As Justice Marshall pointed out in his concurring opinion in Furman:

44

v. Georgia, 428 U.S. 153 (1976) (plurality opinion); Woodson v. North Carolina, 428 U.S. 280 (1976) (plurality opinion).  Since that time, the Court has categorically barred the execution of juvenile, mentally retarded, and insane offenders, reiterating that "[c]apital punishment must be limited to those offenders who commit 'a narrow category of the most serious crimes' and whose extreme culpability makes them 'the most deserving of execution.'"  Roper, 543 U.S. at 568 (emphasis added)(quotation marks omitted).  The Court held that it would violate the Eighth Amendment to execute offenders within these three classes, "no matter how heinous the crime," id., and thus did not leave it to judges or juries to decide what weight to give to an offender's youth, mental retardation, or insanity.  These categorical bars "vindicate the underlying principle that the death penalty is reserved for a narrow category of crimes and offenders."  Id. at 568–69.

Accordingly, I cannot see how any procedural hurdle, even AEDPA's bars to filing a second or successive habeas application, can be constitutionally enforced when doing so will eviscerate the constitutionally-protected right that a

---

> It is the poor, and the members of minority groups who are least able to voice their complaints against capital punishment. Their impotence leaves them victims of a sanction that the wealthier, better-represented, just-as-guilty person can escape. So long as the capital sanction is used only against the forlorn, easily forgotten members of society, legislators are content to maintain the status quo, because change would draw attention to the problem and concern might develop. Ignorance is perpetuated and apathy soon becomes its mate, and we have today's situation.

Id. at 366 (Marshall, J., concurring).

45

juvenile, mentally retarded, or insane offender has not to be executed. Cf. In re Webster, 605 F.3d 256, 260 (5th Cir. 2010) (Wiener, J., concurring) ("I continue to harbor a deep and unsettling conviction that, albeit under Congress's instruction which ties our judicial hands so illogically, we today have no choice but to condone just such an unconstitutional punishment.").

## II.

The majority believes that we cannot grant permission for a federal court to hear Hill's present application because he cannot satisfy the procedural hurdles of 28 U.S.C. § 2244(b)(2)(B)(ii), which govern when a "second or successive" habeas petition can be heard. I do not quarrel with whether Hill's claim fits within the requirements of this statutory provision because, as I see it, and as explained above, Congress cannot have intended to preclude federal habeas relief for an individual who is constitutionally ineligible for execution.[7] Claims of freestanding

---

[7] However, I disagree with the majority's position that Hill's present claim, that his execution would be in violation of the Eighth Amendment because he can establish the fact of his mental retardation beyond a reasonable doubt, would be barred under 28 U.S.C. § 2244(b)(1). This provision requires a federal court to dismiss "[a] claim presented in a second or successive habeas corpus application . . . that was presented in a prior application[.]" As the majority sees it, Hill previously raised the claim that he could establish the fact of his mental retardation beyond a reasonable doubt, but the majority's position is based on reading legal arguments into the factual assertions that Hill presented in his first federal habeas petition.

Hill argued in his prior federal habeas petition that his execution would violate the Eighth Amendment, not because he could establish the fact of his mental retardation beyond a reasonable doubt, but because Georgia's legal standard of proof of beyond a reasonable doubt was contrary to or an unreasonable application of Atkins where the state habeas court had found him to be mentally retarded by a preponderance of the evidence. When his prior federal petition is considered in its entirety it is clear that Hill's argument was limited to a challenge to Georgia's insuperably high burden of proof for mental retardation. This court's (now-vacated) panel

46

actual innocence of the underlying offense and categorical ineligibility for the death penalty, as here in Hill's case, "do not fit neatly into the narrow procedural confines delimited by AEDPA." In re Davis, 565 F.3d at 827 (Barkett, J., dissenting). Such claims cannot be subject to AEDPA's restrictions when doing so will ensure that the U.S. Constitution is violated. See, e.g., Herrera v. Collins, 506 U.S. 390, 402 (1993) ("[F]ederal habeas courts act in their historic capacity–to assure that the habeas petitioner is not being held in violation of his or her federal constitutional rights.").

Indeed, the Supreme Court has not always adhered to a strict construction of 28 U.S.C. § 2244, particularly when determining whether a claim is subject to the restrictions on filing a "second or successive" habeas petition. In Stewart v. Martinez-Villareal, 523 U.S. 637, 645 (1998), the Court concluded that the restrictions on second or successive applications for federal habeas relief would not preclude a federal court from hearing a petitioner's Ford claim that he was categorically exempt from execution because of insanity. At the time the state

opinion also confirms that the only claim before this Court was the purely legal claim of whether Georgia's standard of proof was an unreasonable application of or contrary to Atkins. Our en banc decision addressed the same question.

While it is true that Hill has consistently asserted the fact that he is mentally retarded, nowhere in his prior federal habeas petition, our original panel decision, nor our en banc decision, was the question raised or answered of whether Hill had established his mental retardation beyond a reasonable doubt. See Hill, 662 F.3d at 1362 (Tjoflat, J., concurring) ("Hill's real complaint is not that he is mentally retarded, and that the state post-conviction court's contrary conclusion was erroneous. Hill instead argues that the state post-conviction proceeding utilized an unfair procedure for determining whether he is mentally retarded.")

issued a warrant for his execution, Martinez-Villareal sought federal habeas relief on his Ford claim. Martinez-Villareal, 523 U.S. at 640. Even though the Court acknowledged that this was the second time the petitioner had asked for relief pursuant to Ford, it did not treat the present claim as a second application for relief even though his Ford claim had previously been dismissed as premature. Id. The Court instead concluded that because the Ford claim was now ripe for adjudication, there had only been one application for relief and 28 U.S.C. § 2244(b) did not bar review of the claim. Id.

Subsequently, in Panetti v. Quarterman, 551 U.S. 930, 945 (2007), the Court addressed the related question of whether a Ford claim raised for the first time in a petition, after a petitioner's other federal habeas claims had already been rejected in an earlier petition, should be treated as a second or successive application. As it did in Martinez-Villareal, the Court explained that "the implications for habeas practice would be far reaching and seemingly perverse" were it to strictly construe the meaning of "second or successive" under these circumstances. Id. at 943 (citing to Martinez-Villareal, 523 U.S. at 644). Accordingly, the Court concluded "that Congress did not intend the provisions of AEDPA addressing 'second or successive' petitions to govern a filing in the unusual posture presented here: a § 2254 application raising a Ford-based incompetency claim filed as soon as that claim is ripe." Id. at 945.

48

Simply put, the Supreme Court has recognized that "[t]here are, however, exceptions" to AEDPA's "second or successive" bar to the filing of a federal habeas petition second in time. Id. at 947. In the cases of Martinez-Villareal and Panetti, the Court was unwilling to construe AEDPA "in a manner that would require unripe (and, often, factually unsupported) claims to be raised as a mere formality, to the benefit of no party." Id.

The Court, likewise, has refused to construe AEDPA in a way that would undermine the "equitable principles [which] have traditionally governed the substantive law of habeas corpus." Holland v. Florida, 130 S. Ct. 2549, 2560 (2010) (internal citation and quotation marks omitted). In Holland, the Court specifically rejected the contention that allowing equitable tolling of the one year statute of limitation for filing a federal habeas petition would undermine one of AEDPA's "basic purposes" of eliminating delays in the process. Id. at 2562. Instead, the Court reiterated that Congress did not "los[e] sight of the fact that the 'writ of habeas corpus plays a vital role in protecting constitutional rights.'" Id. (quoting Slack v. McDaniel, 529 U.S. 473, 483 (2000)).

> [Congress] did not seek to end every possible delay at all costs. The importance of the Great Writ, the only writ explicitly protected by the Constitution, Art. I, § 9, cl. 2, along with congressional efforts to harmonize the new statute with prior law, counsels hesitancy before interpreting AEDPA's statutory silence as indicating a congressional intent to close courthouse doors that a strong equitable claim would ordinarily keep open.

49

Id.

Contrary to the State and the majority's view that Hill's claim cannot be heard because the statute only addresses guilt of the "underlying offense," I do not believe that we must "interpret[ ] AEDPA's statutory silence" regarding claims that an offender is categorically barred from receiving a sentence of death "as indicating a congressional intent to close courthouse doors that a strong equitable claim would ordinarily keep open." Holland, 130 S. Ct. at 2562. Indeed, although Ford's ban on the execution of the insane pre-dates AEDPA's enactment, it is telling that the Supreme Court has not construed AEDPA to bar a petitioner from raising a Ford claim in what would otherwise be considered a second or successive habeas petition. See Martinez-Villareal, 523 U.S. at 643; Panetti, 551 U.S. at 945. Likewise, it simply cannot be that Congress would have intended AEDPA to preclude a federal court from hearing the claim of a juvenile or mentally retarded offender who obtains, albeit after the conclusion of his prior federal habeas proceedings, irrefutable proof that his status constitutionally bars his execution forever.

Just as the Court was able to reconcile AEDPA's finality concerns with habeas's equitable principles in the context of a Ford claim, AEDPA's requirements should not be construed to require the unconstitutional execution of a mentally retarded offender who, by presenting evidence that virtually guarantees

50

that he can establish his mental retardation, is able to satisfy even the preposterous burden of proof Georgia demands. If the Supreme Court means that the mentally retarded cannot be constitutionally executed, and Hill has now shown beyond any reasonable doubt that he is mentally retarded, a congressional act cannot be applied to trump Hill's constitutional right not to be executed.[8]

---

[8] Although, as the majority notes, notwithstanding this court's denial of his application, Hill still may petition the Supreme Court for a writ of habeas corpus under its original jurisdiction, see Maj. Op. at 37 n.20 (citing Felker v. Turpin, 518 U.S. 651, 661–63 (1996)); see also In re Davis, 565 F.3d at 826–27. Nonetheless, the potential availability of this alternative avenue for relief does not, as I see it, mean that federal courts do not have the authority or responsibility to enforce the constitutional mandates of the Supreme Court through the equitable remedy of habeas.

# APPENDIX A

Case 1:04-cv-00151-WLS   Document 2   Filed 10/05/04   Page 2 of 110

## TABLE OF CONTENTS

PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . .3

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . .5

CLAIMS ENTITLING PETITIONER TO RELIEF . . . . . . . . . . . .10

CLAIM ONE          MR. HILL IS MENTALLY RETARDED, AND
                   HIS  EXECUTION  WOULD  VIOLATE  THE
                   EIGHTH AND FOURTEENTH AMENDMENTS TO
                   THE UNITED STATES CONSTITUTION.

A.   Warren Lee Hill is Mentally Retarded . . . . . . . . .12

   1.   Mr. Hill Has Significantly
        Subaverage Intellectual Functioning . . . . . . 13

   2.   Mr. Hill Has Significant Limitations
        in Adaptive Functioning . . . . . . . . . . . . 15

B.   Mr. Hill's Case Illustrates the Risk that the
     Death Penalty in Georgia Will Be Imposed in
     Spite of Factors Which May Call for a Less
     Severe Penalty. . . . . . . . . . . . . . . . . . . .19

C.   Georgia's "Beyond a Reasonable Doubt" Standard
     of Proof for Mental Retardation Claims
     Violates the Eighth and Fourteenth Amendments. . . . 25

   1.   The  "beyond  a  reasonable doubt"
        standard violates the Fourteenth
        Amendment and Cooper v. Oklahoma. . . . . . . . 26

   2.   The "beyond-a-reasonable-doubt"
        standard  renders  death  sentences
        inherently unreliable in cases where
        offenders claim they are mentally
        retarded. . . . . . . . . . . . . . . . . . . . 28

D.   The    "Beyond-a-Reasonable-Doubt" Standard
     Unfairly Imperils the Lives of Mildly Mentally
     Retarded Offenders like Warren Hill. . . . . . . . . 30

i

# APPPENDIX B

STATE OF GEORGIA

COUNTY OF JONES

## AFFIDAVIT OF THOMAS H. SACHY M.D., MSc.

Comes now the Affiant, Thomas H. Sachy M.D., MSc., who, after being duly sworn by an officer authorized by law to administer oaths, deposes and states as follows:

1.    My name is Thomas H. Sachy. I am over the age of twenty-one and competent to testify to the truth of the matters set forth in this statement. The opinions I make in this statement are made to a reasonable degree of scientific and psychiatric certainty, based on information experts in my field regularly rely upon.

2.    I am a medical doctor and a neuropsychiatrist with a private practice at 247 Lana Dr., Gray, Georgia 31032; telephone 478-986-0484. I received my M.D. from the Medical College of Georgia in 1995, completed my residency training in General Psychiatry as well as a fellowship in Behavioral Neurology in 1999 at the Medical University of South Carolina, and I completed a fellowship in Forensic Psychiatry at Emory University in 2000. I am licensed in Georgia and am Board Certified in Psychiatry and Forensic Psychiatry with the American Board of Psychiatry and Neurology. My Curriculum Vitae is attached.

1

3.    In 2000, my training had focused primarily on patients with brain injuries and seizure disorders. Most of these patients had Alzheimer's or other frontal lobe dementia. I had my fellowship in Forensic Psychiatry at Emory University in June 2000 and had taken a half-time position at Central State Hospital in Milledgeville, Georgia, as a forensic psychiatrist. I did not have experience evaluating patients for mental retardation. I had almost no experience testifying in a forensic context.

4.    In November 2000, I was asked to evaluate a death-sentenced prisoner named Warren Lee Hill, Jr., in connection with proceedings to determine whether he was mentally retarded. This was my first experience working on a capital case. I ultimately evaluated Hill on December 11, 2000, for approximately one hour and provided my findings to Dr. Gary Carter M.D. and Dr. Donald Harris Ph.D. at Central State Hospital. On December 11, 2000, Dr. Carter assembled a report which included my impressions gleaned from some records pertaining to Hill, and on December 12, 2000, I produced a separate written report after my evaluation of Mr. Hill the day previously. I testified at the habeas corpus hearing in Hill's case on or about December 13, 2000. The whole process, including my evaluation of Mr. Hill, was rushed due to this compressed timetable.

2

5.    In late July 2012, I noticed media reports about a man whom courts had found to be mildly mentally retarded and who was nevertheless facing execution. I then realized that this man was Warren Lee Hill, and I remembered that I had evaluated him for the government many years ago. Not realizing that a stay of execution had already been entered in the case, I contacted Mr. Hill's counsel on July 27, 2012, and offered to discuss the case. I told counsel I felt that my previous conclusions about Mr. Hill's mental health status were unreliable because of my lack of experience at the time, and I wanted to revisit the case. Since that time, at my request, Mr. Hill's counsel has provided me with my original notes and reports in the case, as well as additional extensive materials from the court record (Butts Co. Superior Court Case No. 94-V-216), much of which I had not reviewed in 2000. These materials include: the entire transcript of the habeas corpus hearing in December 2000, affidavits of teachers, friends, family members, and Navy associates; school and Navy records; reports and affidavits of Drs. Grant, Dickinson, and Stonefeld; examples of letters purportedly written by Mr. Hill while in prison; and a 20 year old memo from social worker Carol Peddy to Mr. Hill's original trial attorneys. I have also reviewed the United States Supreme Court's decision in *Atkins v. Virginia*, 536 U.S. 304 (2002).

3

6. Having reviewed my earlier evaluation results and the far more extensive materials from the record of this case, I believe that my judgment that Mr. Hill did not meet the criteria for mild mental retardation was in error. In my opinion today, within a reasonable degree of scientific certainty, Mr. Hill has significantly subaverage intellectual functioning with an IQ of approximately 70, associated with significant deficits in adaptive skills, with onset prior to age 18. I thus concur with the conclusions (rendered previously in Mr. Hill's case) of Dr. Daniel Grant, Dr. Jethro Toomer, Dr. Donald Stonefeld, and Dr. William Dickinson that Mr. Hill meets the criteria for mild mental retardation and the bases for those conclusions which they articulated.

7. During my evaluation of Mr. Hill in December 2000, some things in particular persuaded me at the time that, as I wrote in my report of December 12, 2000, he was "malingering a cognitive disorder" and that he did not meet the criteria for mild mental retardation but rather for borderline intellectual functioning. As I noted in my report of December 12, 2000 and in my testimony, Mr. Hill's repeated response of "I don't know" to my questions I interpreted as a sign of malingering. Mr. Hill also did not attempt even to guess at answers and often seemed uncooperative generally. He answered many questions correctly, but also missed or said "I don't know" to questions I would have thought he would

4

56

have no trouble answering. I also gave great weight to Mr. Hill's somewhat poor attempt to copy a drawing of intersecting pentagons as a signal of malingering. I also saw letters Mr. Hill had purportedly written to his counsel which seemed to be more advanced for a mentally retarded person. Finally, I simply found it difficult to believe that someone with mental retardation could function even minimally in the United States Navy as a petty officer, although I have never served in the military.

8.      Therefore, at the hearing in December 2000, I was unprepared to find that Mr. Hill met the criteria for mild mental retardation. However, since that time, I have had the opportunity to practice psychiatry for an additional 12 years – almost my entire career as a psychiatrist – and I have treated an extremely wide variety of patients in that time, including many who were mentally retarded. The scientific understanding of mental retardation has also expanded, and the protocols for determining whether a patient is "malingering" or feigning a mental disorder have become more sophisticated, as have the scientific conclusions which can be drawn from such behavior. I have had far more experience with patients who may technically have "malingered" or feigned certain symptoms, but who nevertheless have real mental disorders. In other words, I have vastly greater experience as a

5

psychiatrist than I did in 2000 and I have access to better science pertaining to the key questions in Mr. Hill's case.

9.    I do not believe now that Mr. Hill was deliberately feigning a cognitive disorder in 2000, and I believe that his responses to my questions were consistent with mild mental retardation.  At the time of the 2000 Central State evaluation, I and the other state clinicians followed the DSM-IV in placing great weight on the medico-legal context of the evaluation as well as on the seeming lack of cooperation of the patient as signs of intentional feigning.   In the psychiatric community, we now know that reliance on the DSM criteria has resulted in an extremely high rate of false findings of malingering.  See e.g., R. Rogers, *Clinical Assessment ofMalingering and Deception*, 2nd Ed. (1997); Drob, Meehan and Waxman, *Clinical and Conceptual Problems in the Attribution of Malingering in Forensic Evaluations*, J Am Acad Psychiatry Law 37:98-106 (2009).  False positive findings of malingering have been found to be related to the training that young psychiatrists undergo which places heavy emphasis on ferreting out malingering, leading to its overdiagnosis.  I had just emerged from this kind of training when I evaluated Mr. Hill.  But, importantly, even where patients do feign (e.g., by being "uncooperative"), this in no way rules out a real underlying disorder.  The feigning may even be part of the symptomology of the disorder.  Id.

6

58

10.    Based on my experience since then, as well as on science's current understanding of behaviors once thought to be associated with malingering, it is my opinion that the kinds of behaviors that I perceived during my evaluation – limited or inconsistent memory, lack of cooperation, poor test performance, etc. – were consistent with responses to the stress of the situation typical of someone with an intellectual disability and are even symptomatic of a defense mechanism related to past documented trauma in Mr. Hill's background.  See, e.g., Drob, Meehan and Waxman (2009).  These behaviors must also be assessed in the context of the rushed time frame in which my evaluation occurred – literally the day before the December 2000 evidentiary hearing, which was undoubtedly a stressful moment in time for Mr. Hill.  I also had only an hour to spend with Mr. Hill.

11.    Finally, in the psychiatric community we now understand that access to an expansive fund of collateral information about the patient is essential in order to form an accurate diagnosis of mental functioning and to accurately contextualize a patient's behaviors which may be superficially consistent with feigning or malingering.  See, e.g., Drob, Meehan and Waxman (2009).

12.    With this in mind, Mr. Hill's "I don't know" response cannot be seen as indicative of malingering in the context of the record in this case.  For example,

7

59

a memo by a defense social worker in approximately 1990-91 (part of Respondent's Exhibit 53 in the record in Mr. Hill's case) indicates that even with defense team members prior to his trial, Mr. Hill showed "poor verbal skills and [found] it difficult, almost impossible to express thoughts and feelings. Many questions were answered with 'I don't know.'" At the 2000 hearing also, Mr. Hill was described by his trial level attorneys as being extremely uncommunicative and withholding. I was not privy to this information at the time of my evaluation or testimony. I find the "I don't know" response to be consistent with mild mental retardation in Mr. Hill and also with schizoid symptoms other clinicians identified. Finally, in light of my experience treating patients since 2000, I do not today see these kinds of responses as indicative of deliberate feigning.

13.    With respect to Mr. Hill's crude drawing of a clock face and somewhat distorted copying of two intersecting pentagons, these too cannot be considered emblematic of deliberate feigning, particularly in light of the fact that Mr. Hill's hands were cuffed during his attempts to draw them. Furthermore, at the time, I had not reviewed the findings of Dr. Daniel Grant, who had conducted neuropsychological testing in 1997 (part of the court record) and found signs of organic impairment which could have contributed to the less than perfect rendering of the pentagons. (In my testimony in 2000, furthermore, I remarked that there

8

should have been some indication of mental retardation in neuropsychological findings, but since I had not seen Dr. Grant's findings I did not know that, in fact, there had been findings consistent with mild mental retardation in his neuropsychological testing.) Finally, having treated many hundreds more patients since 2000, I do not find these drawings to be in any way indicative of intentional feigning.

14.    With respect to the letters Mr. Hill purportedly wrote to his counsel (see Petitioner's Exhibit 106 and 110 from the court record), I have been provided with other written correspondence purportedly from Mr. Hill located in his prison file (part of Petitioner's Exhibit 85 at pp2709, 2712 of the court record) which in my view are clearly in another person's handwriting, as well as more recent letters purportedly from Mr. Hill which explicitly indicate that they have been written by another inmate. Therefore, I cannot say that the letters I originally examined were actually written by Mr. Hill without assistance from another inmate or counselor. In any event, they cannot provide a basis to rule out mild mental retardation.

15.    At the time of the 2000 court hearing, I did not observe the testimony of any other witnesses. I was not privy to the testimony of Navy psychologist Dr. Jerry Brittain and Army psychiatrist Dr. Donald Stonefeld. I was also not privy to the testimony of William Erwin and Al Grieshaber, Mr. Hill's original trial

9

attorneys. Mr. Grieshaber is a former military servicemember. I have now had the opportunity to review their testimony. What the testimony of these individuals helps me understand now is that a mildly mentally retarded individual like Mr. Hill could have functioned adequately at least for a time in the structured setting of the Navy at the rank of E5 or petty officer. As the testimony made clear, mild mental retardation would not have prevented Mr. Hill from carrying out his duties as an ordnance loader given the many layers of supervision under which he functioned. As Dr. Brittain describes, Mr. Hill began to decompensate once he transferred from the Naval Air Station in Boston to NAS Atlanta, where he was given additional responsibilities which he did not have the coping skills to manage. Further, poor interpersonal and relationship skills caused him to be unable to manage stress in his relationship with Myra Wright, his girlfriend in Atlanta. There came a time when Mr. Hill decompensated and had to be brought home to live with relatives. Mr. Hill never lived alone.

16. The Navy records, which I had also not seen in 2000, further show that although Mr. Hill was recommended for advancement to the rank of E6, he was passed over for promotion. Thus, there appears to have been recognition, consistent with the affidavits of Mr. Hill's Navy associates, that Mr. Hill was not able to maintain a level of functioning past a certain point – which is consistent

10

with mild mental retardation. The expanded information pertaining to Mr. Hill's Navy service persuades me that his service was not inconsistent with mild mental retardation and in fact the trajectory of his performance in the Navy is very consistent with that of a mildly mentally retarded person who encountered stresses with which he was unable to cope.

17. Finally, the totality of evidence shows that far from "malingering a cognitive disorder," Mr. Hill has had a cognitive disorder with adaptive skill deficits since early childhood. He consistently tested in the 2-3 percentile in childhood achievement and intelligence testing, consistent with mild mental retardation. There was no dispute in 2000 among the clinicians who had evaluated Mr. Hill that he has an IQ of approximately 70. There is also evidence of significant deficits in such areas of his functioning as self-care, functional academics, interpersonal skills, and home living since prior to age 18. I concur with Drs. Grant, Stonefeld, Toomer, and Dickinson in this respect. With respect to Mr. Hill's ability to acquire a driver's license, drive vehicles, hold a job, or have relationships with women, these are not outside the scope of the abilities of people with mild mental retardation.

18. In 2000, my erroneous judgment that Mr. Hill was deliberately feigning a disorder, as well as the narrow scope of information I reviewed, resulted

11

in my error in finding that Mr. Hill was not mentally retarded. However, having learned about and revisited the issues of malingering and mental retardation and having reviewed extensive additional materials from the court record in Mr. Hill's case, my conclusion now, to a reasonable degree of scientific certainty, is that Mr. Hill meets the criteria for mild mental retardation as set out in the DSM-IV-TR and as delineated by the American Association on Intellectual and Developmental Disabilities (AAIDD). That is: Mr. Hill has significantly subaverage general intellectual functioning associated with significant deficits in adaptive functioning, with onset before the age of 18.

Dated this 8 day of February , 2013.

_____

Thomas H. Sachy

Sworn to and subscribed before me
this 8 day of February , 2013.

_____
NOTARY PUBLIC

KIRSTEN ANDREA SALCHOW
NOTARY PUBLIC
FULTON COUNTY, GEORGIA
MY COMMISSION EXPIRES MAY 1, 2015

12

# Curriculum Vitae
## THOMAS HEWITT SACHY, M.D., M.Sc.

www.gabehavioral.com
P.O. Box 1726 Gray, Georgia 31032
Email: gapbm@hotmail.com, Telephone: (478) 986-0484 Fax: (478) 986-0486

**CERTIFICATIONS ATTAINED** American Board of Psychiatry and Neurology – Psychiatry/ Forensic Psychiatry

**MEDICAL LICENSES**        Georgia

## FELLOWSHIP/POSTGRADUATE TRAINING

### PAIN MANAGEMENT

**Responsible Opioid Prescribing: A Physician's Guide**        6/19/2010
The University of Wisconsin School of Medicine and Public Health

**Advanced Interventional Pain Management and Injection Therapy of the**        1/24/2004 – 1/25/2004
**Lumbo-Sacral Spine and Extremities**
*Empire Medical Training,* Fort Lauderdale, Florida

**FORENSIC PSYCHIATRY**        7/01/1999 – 6/30/2000
*Emory University School of Medicine,* Dept. of Psychiatry, Atlanta, Georgia

**BEHAVIORAL NEUROLOGY**        7/01/1998 – 6/30/1999
*The Medical University of South Carolina,* Dept. of Neurology, Charleston, South Carolina

## RESIDENCY TRAINING

### General Psychiatry        7/01/1995 – 6/30/1999
*The Medical University of South Carolina,* Dept. of Psychiatry, Charleston, South Carolina
National Ranking on Senior Year Psychiatry Residency In-Training Examination:
Neurology Score: First Percentile; Psychiatry Score: Fifth Percentile

## MEDICAL EDUCATION

### Doctor of Medicine        6/10/1995
*The Medical College of Georgia,* Augusta, Georgia
Cumulative G.P.A. – 3.76, Class Rank: 20 in a Class of 191
Recipient: AMA Rock Sleyster Memorial Scholarship
The Medical College of Georgia Scholarship
The Federal Health Professions Scholarship

## GRADUATE EDUCATION

### Master of Science in Biology        8/27/1994
*Georgia State University,* Atlanta, Georgia
Cumulative G.P.A. – 3.86
Research Project: *A Preliminary Investigation of In Vitro Albumin-Mercury*
*Interactions, The Linear II Covalent Bond.* Advisor: Delon Barfuss, Ph.D.
Recipient: Lifetime Membership – Golden Key National Honor Society
Graduate Research Assistantship 1990 – 1991
Deans List 1989 – 1991

1

Curriculum Vitae

## UNDERGRADUATE EDUCATION

**Bachelor of Science in Electrical/Computer Engineering**          11/10/1988
*The University of Calgary,* Calgary, Alberta, Canada

**Bachelor of Science in General Studies**                         11/01/1985
*The University of Calgary,* Calgary, Alberta, Canada
    Recipient: The Alexander Rutherford Scholarship 1981 – 1982
              The Pan-Canadian Petroleum Scholarship 1981 – 1982

## EXPERIENCE

**Forensic Psychiatry/Neuropsychiatry**                     7/15/2000 – Present

### LANDMARK CASES:

#### State of Georgia vs. Reinaldo Rivera [2004]

For the first time in the State of Georgia, the science of Positron Emission Tomography [PET Scanning] was successfully introduced and accepted as lawful evidence, in a criminal trial involving the issues of guilt, innocence, and psychopathy.

#### State of South Carolina vs. Stephen Stanko [2006]

For the first time in the State of South Carolina, the science of Positron Emission Tomography [PET Scanning] and Brain MRI Morphological Analysis was successfully introduced and accepted as lawful evidence, in a criminal trial involving the issues of guilt, innocence, and psychopathy.

#### Tavaris Smith vs. State of Georgia [2008]

For the first time in the State of Georgia, a sleepwalking defense was introduced as a defense in a criminal trial involving the charge of murder [State of Georgia vs. Tavaris Smith 2005]. Mr. Smith was subsequently convicted in that case.

*In 2008, the Supreme Court of Georgia unanimously reversed this conviction* stating; "We conclude that the trial court erred in classifying Smith's defense as an insanity defense, in informing the jury that it was classifying Smith's defense as an insanity defense, and in instructing the jury on the defense of insanity during its charge. Moreover, we conclude this error was prejudicial to Smith, as Smith's own expert [Thomas Sachy, M.D.] testified that he did not meet the legal definition of insanity, but that he may have committed the crime in question during a period of unconsciousness due to sleep disorders from which he was suffering...For these reasons, the trial court's imposition of the insanity defense detracted from Smith's primary defense that he did not commit the acts in question voluntarily and with criminal intent."

## Pain Management/Clinical Psychiatry/Neuropsychiatry

#### Georgia Pain and Behavioral Medicine:                    11/1/2002 – Present

Diagnosis and Treatment of Neuropsychiatric and Chronic Pain Disorders
Independent Medical Evaluations

**Expert Witness - Pain Management**

**Committee Member – Expert Witness - Peer Review Committee: Pain Management**
          **Georgia Composite State Board of Medical Examiners**

2

Curriculum Vitae

<u>EXPERIENCE</u> Continued

<u>Forensic Consultation Services</u>

**Committee Member – Georgia Public Defender Standards Council - Forensic Advisory Committee – Mission: To establish expert witness standards for the statewide agency that oversees public defenders in the State of Georgia.**

**Forensic Psychiatric Evaluations and Expert Witness Testimony** including consultation for: The U.S. Department of Justice, The Office of the Attorney General of Georgia, The Dekalb County Public Defender's Office, The Fulton County Conflict Defenders Office, and The Bibb County Public Defender's Office, and the Georgia Department of Juvenile Justice.

<u>Assistant Professor of Psychiatry and Behavioral Science</u>          5/14/2001 - 6/30/2002
Mercer University School of Medicine, Macon, Georgia

<u>Clinical Director of Forensic Services</u>
Central State Hospital, Milledgeville, Georgia          7/15/2000 – 7/18/2001
Responsibilities: Administration of Medical Staff Activities, Forensic Services Program Management, Inpatient Forensic Psychiatry Evaluations and Behavioral Neurology Consultations

<u>Forensic Psychiatry Fellow</u>          7/1/1999 – 6/30/2000
Emory University School of Medicine
**Staff Forensic Psychiatrist, Psychiatry and Law Service**
Responsibilities: Expert witness testimony – Forensic Psychiatry, Neuropsychiatry. Litigation strategy – case evaluation, expert rebuttal. Inpatient and outpatient forensic examinations, with emphasis on competency to stand trial, criminal responsibility and sentencing evaluations/recommendations; Independent medical evaluations. (Grady Memorial Hospital, Georgia Regional Hospital – Atlanta, Central State Hospital – Milledgeville, Fulton County Jail)
**Staff Psychiatrist, Dekalb County Jail,** Correctional Psychiatry

<u>Behavioral Neurology Fellow</u>          7/1/1998 – 6/30/1999
The Medical University of South Carolina
**Staff Physician, Memory Disorders Clinic**
Responsibilities: Evaluation and treatment of dementia and related neurodegenerative disorders, movement disorders, seizure disorders, sleep disorders and traumatic brain injury. Inpatient Neurology Consultations (For the MUSC Institute of Psychiatry). Forensic Psychiatric and Neurologic Evaluations Capital Crimes
**Associate Staff Physician – Geriatric Psychiatry**
(Life Care of Charleston, geriatric nursing facility)

<u>Resident in Psychiatry</u>          7/1/1995 – 6/30/1999
The Medical University of South Carolina
Additional Responsibilities:
**Associate Emergency Department Physician**
Emergency Medicine. (Charleston Memorial Hospital)
**Part Time Designated Medical Examiner**
Court Ordered Psychiatric Evaluations.
(Charleston/Berkeley County Probate Courts)
**Staff Psychiatrist**
MUSC Emergency Psychiatry Service (MOBILE CRISIS)
(Berkeley County Mental Health Center
Charleston Mental Health Center)

3

**Curriculum Vitae**

**EXPERIENCE** Continued

**Electrical/Computer Engineer**                                              9/1/1988 – 9/15/1989
American Technical Services, Atlanta, Georgia
      **Project Engineer - Software Engineer**
      Responsibilities:  Design and implementation of engineering software systems for programmable
             logic controllers, computer aided design and project billing applications

## MEDICAL/LEGAL EDUCATION PRESENTATIONS

**Urine Drug Testing in Psychiatry**                                          1/21/2013
      Millennium Laboratories East Regional Meeting
      Atlanta, Georgia

**Neuropsychiatry and Chronic Pain**                                          4/11/2012
      12th Annual National Association of Disability Representatives
      Social Security Law Conference
      New Orleans, Louisiana

**The Neurobiology of Fibromyalgia**                                          2/16/2012
      Social Security Law Seminar
      Institute of Continuing Legal Education in Georgia
      State Bar of Georgia Headquarters, Atlanta, Georgia

**The Neurobiology of Chronic Pain Disorders**                               11/3/2011
      Social Security Disability Law Conference
      National Organization of Social Security Claimants' Representatives
      San Antonio, Texas

**The Neurobiology of Chronic Pain Disorders**                               2/17/2011
      Social Security Law Seminar
      Institute of Continuing Legal Education in Georgia
      State Bar of Georgia Headquarters, Atlanta, Georgia

**Neuropsychiatric and Developmental Disorders in Children**                11/15/2010
      District Meeting, Jones County Foster Parent's Society

**Neuropsychiatric Aspects of Pain Management**                              1/15/2009
      District Meeting, Greater Atlanta Pain Society
      Atlanta, Georgia

**Neuroscience of Depression and Suicide**                                   11/20/2008
      Central Georgia District Meeting, Georgia Dental Association
      Macon, Georgia

**Treating Fibromyalgia Pain**                                               9/25/2008
      Physicians Education Conference
      Upson Regional Medical Center, Thomaston, Georgia

**The Science of Fibromyalgia**                                              4/17/2008
      Central Georgia Fibromyalgia Support Network
      Coliseum Medical Centers, Macon, Georgia

**Forensic Psychiatry and the Law**                                          1/31/2008
      Mercer University School of Law, Macon, Georgia

**Forensic Psychiatry and the Law**                                          3/29/2007
      Mercer University School of Law, Macon, Georgia
4

**Curriculum Vitae**

MEDICAL/LEGAL EDUCATION PRESENTATIONS Continued

| | |
|---|---|
| Alzheimer's Disease: Understanding Medication Management<br>    2007 Alzheimer's Conference, Central Georgia Alzheimer's Association<br>    Warner Robins, Georgia | 3/8/2007 |
| Insomnia: New Trends in the Pharmacological Treatment of Insomnia<br>    Grand Rounds, Southern Regional Health System<br>    Southern Regional Medial Center, Riverdale, Georgia | 5/24/2006 |
| Use of Anti-Epileptic Medications in the Treatment of Bipolar Disorder<br>    Psychiatry Residents, The Medical College of Georgia<br>    Augusta, Georgia | 5/18/2006 |
| Similarities and Differences Among Serotonin Reuptake Inhibitors<br>    Low Country Pharmacists Association<br>    Charleston, South Carolina | 4/18/2006 |
| Forensic Psychiatry and the Law<br>    Mercer University School of Law, Macon, Georgia | 4/13/2006 |
| Assessment and Treatment of Breakthrough Cancer Pain<br>    Arden, North Carolina | 3/23/2006 |
| Critical Developments in Forensic Psychiatry<br>    Georgia Association of Criminal Defense Lawyers<br>    Fall Seminar 2005<br>    Brasstown Valley Resort, Young Harris, Georgia | 11/5/2005 |
| Forensic Psychiatry and the Law<br>    Mercer University School of Law, Macon, Georgia | 2/17/2005 |
| Forensic Psychiatry and the Law<br>    Mercer University School of Law, Macon, Georgia | 4/22/2004 |
| Neuroscience of Depression<br>    Northeast Alabama Regional Medical Center<br>    Anniston, Alabama | 3/18/2004 |
| Forensic Issues in Postpartum Depression<br>    Neonatal - Perinatal Symposium 2003<br>    The Medical Center of Central Georgia, Macon, Georgia | 11/06/2003 |
| Neuroscience of Depression<br>    Grand Rounds, Department of Psychiatry<br>    The Medical College of Georgia, Augusta, Georgia | 10/30/2003 |
| Neuro-Psychiatric Treatment of Chronic Pain<br>    Atlanta Pain Society<br>    Atlanta, Georgia | 9/11/2003 |
| Neuro-Psychiatry of Bipolar Affective Disorder<br>    Georgia Society of Health-System Pharmacists<br>    Columbus, Georgia | 8/5/2003 |
| Neuroscience of Dementia<br>    Middle Georgia Assisted Living Coalition<br>    Macon, Georgia | 6/25/2003 |

5

Curriculum Vitae

MEDICAL/LEGAL EDUCATION PRESENTATIONS Continued

Treating Anxiety and Depression to Remission                                    6/14/2003
      110th Annual Convention of the Georgia State Medical Association
      Hilton Head Island, South Carolina

Neuroscience of Depressive Disorders                                           5/8/2003
      Houston County Medical Society Annual Meeting
      Dothan Alabama

Neuro-Psychiatric Functions of Dopamine                                        9/6/2002
      Grand Rounds, Department of Family Medicine
      Mercer University School of Medicine, Macon, Georgia

Neuro-Psychiatric and Pharmacological Intervention                            8/27/2002
In the Management of Depression and Disabling Pain
      2002 Annual State Board of Workers' Compensation Seminar
      Atlanta, Georgia

Neuro-Psychiatry of Bipolar Disorder                                          1/29/2002
      Middle Georgia Psychological Association
      Macon, Georgia

Neuro-Psychiatric Aspects of Pain                                            8/27/2001
      2001 Annual State Board of Workers' Compensation Seminar
      Atlanta, Georgia

Georgia Landmark Cases – Competency to Stand Trial                           6/22/2000
      Spring 2000 State Wide Forensic Psychiatry Services Meeting
      Georgia Department of Human Resources, Atlanta, Georgia

Confidentiality and the Evaluations of Dangerousness                         5/31/2000
      PGY-1 Psychiatry Residency Class
      Emory University Department of Psychiatry, Atlanta, Georgia

The Insanity Defense and Syndrome Defenses                          3/7/2000 & 3/21/2000
      Criminal Law 525, Winter Semester
      Emory University School of Law, Atlanta, Georgia

Criminal Responsibility Landmark Cases – The Insanity Defense               11/16/1999
      Fall 1999 State Wide Forensic Psychiatry Services Meeting
      Georgia Department of Human Resources, Atlanta, Georgia

The Neurobiology of Adolescent Violence                                     10/15/1999
      1999 Annual Meeting of the American Academy of Psychiatry and the
      Law, Panel Presentation of the Child and Adolescent Forensic Psychiatry Committee
      Baltimore, Maryland

The Neurology of Psychopathy                                                 4/8/1999
      Grand Rounds, Department of Neurology
      The Medical University of South Carolina, Charleston, South Carolina

The Neuropsychiatry of Violent/Criminal Behavior                            5/6/1998
      Psychopharmacology Case Conference, Department of Psychiatry
      The Medical University of South Carolina, Charleston, South Carolina

6

70

Curriculum Vitae

MEMBERSHIPS

American Medical Association

Pain Relief Network

RESEARCH

**Collaborating Physician Investigator:** DSM-5 Field Trials                     6/29/2011 – 1/1/2012

**Co-Investigator:** "Double-Blind Evaluation of Risperidone vs. Haloperidol in the Long Term Morbidity of Early Psychotic Patients." With Samuel Craig Risch M.D. & Janssen Pharmaceutica, 7/1997 – 7/2003

MANUSCRIPT REVIEWER

The Journal of Neuropsychiatry and Clinical Neurosciences

PUBLICATIONS

**"The Life of the Party"** (fiction),
Calgary Mirror, 1980

**"Use of Opioids in Pain Patients with Psychiatric Disorders"**
The Journal of Practical Pain Management. Volume 10, Issue 7, September 2010

**Guest Author - "Tales from the Trenches in the War on Pain"**           12/1/2011 – Present
Pain Treatment Topics (http://Pain-Topics.org)

MEDIA APPEARANCES

| | |
|---|---|
| **9/11/2001: WPGA-TV:** | **58 ABC NEWS – Macon - World Trade Center Attack** |
| | Discussed the psychiatric impact on the nation of the World Trade Center- 9/11 terrorist attacks, on the same day that they occurred. |
| **2004: Discovery Channel:** | **Exorcists – The True Story** |
| | Provided expert commentary regarding the neurological and psychiatric causes of the demonic possession syndrome. Discussed details of the only documented exorcism ever performed in the United States, which subsequently formed the basis for the novel and the movie, The Exorcist. |
| **2005: Discovery Channel:** | **Daily Planet – October 31 2005** |
| | Provided expert commentary regarding the neurological underpinnings involved in the 1976 exorcism and subsequent death of Anneliese Michel. This case served as the basis for the movie, The Exorcism of Emily Rose. |
| **2006: MD News:** | **MD News – January 2006, Volume 3, Number 11** |
| | Cover article describing Dr. Sachy's practice including his expertise in the field of Forensic Neuropsychiatry and its application in the landmark case of the serial killer Reinaldo Rivera. |

7

71

**Curriculum Vitae**

<u>MEDIA APPEARANCES</u> Continued

**2007: CBS News 48 Hours:**            **Murder On His Mind**

"In the summer of 2006, in what is known as low country South Carolina just north of Charleston, for a change it wasn't the heat everyone was talking about – it was the havoc one man wreaked on this small coastal community. As correspondent Troy Roberts reports, Stephen Stanko faced a six-count indictment, including murder and kidnapping. It was the county's first death penalty case in nearly a decade and Stanko stood accused of committing some of the most heinous and brutal crimes in Georgetown in recent memory. Defense expert Dr. Thomas Sachy explains the science behind the argument that a brain defect led Stephen Stanko to become violent."

**2010: SyFy Channel**            **The Haunted Boy**

"A new paranormal documentary film from The Booth Brothers, (Spooked, Children of the Grave, The Possessed, Death Tunnel as seen on SyFy, NBC Universal, Sony Pictures). While filming a haunted asylum in St. Louis, Missouri, documentary filmmakers uncover a secret diary of the infamous 1949 exorcism involving a 13 year old boy possessed by the devil that later inspired the book and movie "The Exorcist". Utilizing hi-tech paranormal gadgetry along with a legion of supernatural experts they search out to capture the scariest entity known to man, "The Unholy Ghost". Nothing you have ever seen or heard before gets you closer to the ungodly truth of what really happened in this most terrifying, best selling story of all time! This is the untold-real story of "The Exorcist", a chronicle of true events based on the actual priest's secret diary the world was not to see, Until Now!"

8